### ASSOCIATES IN ADOLESCENT PSYCHIATRY, S.C., et al., Plaintiffs–Appellants,

v.

### HOME LIFE INSURANCE CO., et al., Defendants–Appellees.

No. 90–2800.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1991.

Decided Aug. 23, 1991.

Rehearing and Rehearing En Banc Denied Oct. 3, 1991.

---

Eugene L. Mahoney, Gregory A. Friedman (argued), Friedman & Holtz, Chicago, Ill., for plaintiffs-appellants.

Joseph J. Hasman, Ernest W. Irons (argued), Peterson & Ross, Chicago, Ill., for Home Life Ins. Co. of New York.

Diane I. Jennings, Don W. Fowler (argued), William T. Weaver, Lord, Bissell & Brook, Chicago, Ill., for Canapary Financial Corp., Robert Canapary and Ronald Aure.

Kurt L. Schultz, Philip L. Harris, Winston & Strawn, Chicago, Ill., for Physician Planning Service Corp. and Rhode Island Hosp. Trust Nat. Bank.

Robert Radasevich, Kenneth M. Brown, Neal, Gerber & Eisenberg, Chicago, Ill., for Pension Actuaries, Inc.

Robert Radasevich, Kenneth M. Brown, Neal, Gerber & Eisenberg, Kenneth R. Gaines, Jeffrey P. DeJong, Stephen R. Kubiczky, Freda J. Levenson, Altheimer & Gray, Chicago, Ill., for Eric Kranke.

Kenneth R. Gaines, Jeffrey P. DeJong, Stephen R. Kubiczky, Freda J. Levenson, Altheimer & Gray, Chicago, Ill., for Levenfeld, Kanter, Baskes & Lippitz, and Jerry H. Biederman.

John H. Gross, Lawrence Kill, John B. Berringer, Ann V. Kramer, Anderson, Kill, Olick & Oshinsky, P.C., New York City, for amicus curiae The UNISYS Pension Inv. Review Committee.

Before COFFEY, EASTERBROOK and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

Associates in Adolescent Psychiatry, S.C., its owner, Marvin P. Schwarz, and his wife (collectively "AAP"), bought a variable annuity and seek relief against Home Life Insurance Company, a Rhode Island bank, and various accountants and lawyers involved in the process. They present claims under the securities acts, ERISA, RICO, and the common law. The district court first granted summary judgment to defendants on the securities and ERISA claims, 729 F.Supp. 1162 (N.D.Ill.1989), and later granted the defendants' motion for summary judgment on the RICO claims, 751 F.Supp. 727 (N.D.Ill.1990), leaving only the state claims, which it dismissed under *United Mine Workers v. Gibbs*, 383 U.S.

715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

## I

A defined benefit plan promises specified levels of benefits on retirement. The employer may set aside amounts actuarially necessary to fund these future payments. In 1977 Schwarz began looking into the possibility of establishing a defined benefit plan for AAP, the professional corporation through which he rendered psychiatric services. Professional corporations often serve principally as sources of tax benefits. Contributions made by an employer are deductible as ordinary and necessary business expenses. 26 U.S.C. § 404(a). As the deduction is limited to the amount necessary to keep the plan fully funded, § 404(a)(1)(A), it may be advantageous to purchase instruments with low stated rates of return. The lower the nominal return, the more the plan needs to remain fully funded, and consequently the higher the permissible deduction. If the investment actually earns more than the stated rate of return, permissible contributions (and deductions) in future years are lower, but the taxpayers have enjoyed benefits in the interim.

Home Life offered Dr. Schwarz a defined benefit plan that allowed for greater annual contributions, and hence greater deductions, than other plans he had seen. Home Life achieved this by using a "Flexible Annuity", an instrument with a relatively low guaranteed rate of return. Sums invested in the Flexible Annuity accumulate earnings at an annual guaranteed rate plus a variable excess rate. The Flexible Annuity that AAP ultimately purchased guaranteed a return of 7% during the first year, 6% for the next two years, 5% for the following two years, and 4% thereafter. The variable rate, referred to in the contract as the "annual dividend", is defined as the "excess, if any, of the interest credited to the Participant's Accumulated Account Value over the interest calculated at the Minimum Interest Rate." The contract provides further that "the interest rate ... applicable to all funds held under this contract [will be] declared annually by the Board of Directors of [Home Life]".

Home Life wished to sell its Flexible Annuity throughout the country but did not want to submit the product for regulatory approval in every state. To accomplish both objectives Home Life entered into an agreement with Rhode Island Hospital Trust National Bank (HTNB) establishing a "Qualified Corporate Plan Trust". This trust is the sole buyer of Flexible Annuities, so Home Life had only to do what was necessary to qualify its offering in Rhode Island, provided that insurance regulators in other states did not balk. Home Life sells the Flexible Annuity to employers as a group annuity contract. An employer, as the sponsor of the defined benefit plan, sends contributions to Home Life, which wires these amounts to HTNB. The bank, as trustee of the corporate plan trust, uses the money to buy a Flexible Annuity from Home Life. The triple-transfer arrangement (employer to Home Life to HTNB to Home Life) entails some delay. HTNB wires funds to Home Life only on Mondays, so it enjoys the float on money received during the preceding week. Home Life credits employers' accounts as soon as it receives their funds, so it bears the cost of the float. Each employee designated as a beneficiary under the plan must sign an agreement enrolling in the trust; the employee receives a certificate memorializing his participation. Each beneficiary receives annual statements from Home Life of the amounts accumulated by virtue of the employer's contributions and the earnings allocated according to the terms of the Flexible Annuity.

The Employee Retirement Income Security Act (ERISA) requires that plan assets be held in trust. 29 U.S.C. § 1103(a). Home Life gave AAP documents establishing a plan trust, naming the two Schwarzes as trustees. Dr. and Mrs. Schwarz executed these documents in July 1977. At the same time, they signed a participation agreement listing them as "Plan Investment Managers". The participation agreement provided that AAP was to fund the plan with two financial instruments: whole life insurance policies and the Flexible Annuity. AAP

made payments under the terms of the Home Life products until 1980. During this period interest rates skyrocketed. Home Life's "excess rate", derived from the return on the insurer's entire portfolio of assets (which was locked into long-term projects), lagged well behind the returns available from short-term investments such as money market funds. This shortfall eclipsed the tax advantages of the plan. AAP regretted its choice and brought this action.

## II

The district court concluded that the Flexible Annuity is not subject to registration under the securities laws. We have no doubt that the Flexible Annuity is an "investment contract" and so comes within the broad definitional clauses of the statutes. See *Reves v. Ernst & Young*, 494 U.S. 56, 64, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946); *Chicago Mercantile Exchange v. SEC*, 883 F.2d 537, 545 (7th Cir.1989). Yet almost all insurance and annuity products are securities, broadly understood, because they entail entrusting money to the hands of others in pursuit of appreciation. The Securities Act of 1933 partitions investments between the world of securities regulation and insurance regulation via § 3(a)(8), 15 U.S.C. § 77c(a)(8), which exempts "[a]ny insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to [state regulation]". AAP conceded at oral argument that the whole life policies come within this exemption. Home Life argues that its Flexible Annuity also falls within § 3(a)(8), and the district court agreed.

Both the district court and the parties devoted substantial energy to the SEC's Rule 151, 17 C.F.R. § 231.151, which establishes a "safe harbor" for some variable annuities. Only persons who rely on a regulation may claim the benefit of its safe harbor. 15 U.S.C. § 77s(a). Rule 151 be-

came effective on June 4, 1986; Home Life introduced the first version of the Flexible Annuity in 1975; AAP purchased its Flexible Annuity in 1977. The SEC's rules may facilitate understanding of statutory law, see *Otto v. Variable Annuity Life Insurance Co.*, 814 F.2d 1127, 1133 (7th Cir. 1986), but the technical details of Rule 151 do not affect the disposition of this case, which we decide under § 3(a)(8).

An ordinary annuity is a promise to pay fixed amounts of money beginning at a time specified in the contract. The seller funds its performance by a combination of the purchase price and income earned by investing that sum. Sellers of annuities invest the receipts in diversified portfolios. All annuities therefore are pooled investment vehicles, but fixed annuities are characterized by a particular division of risk: the buyer obtains a payment stream reflecting assumptions about how well the portfolio will do, and the seller reaps the reward (suffers a loss) if the investments do better (worse). Annuities sometimes contain an element of insurance: they may, for example, promise a monthly payment from retirement until death, so that the total payments are larger the longer the purchaser survives. The seller then bears both investment and insurance risks. For simplicity we disregard the insurance component of annuities (although the Flexible Annuity has such an insurance component).

Traditional annuities in which the exact (monthly or total) amounts to be paid to the purchaser are fixed are not responsive to inflation. This makes them unattractive to investors who cannot otherwise protect themselves against variation in the value of money. Fixed annuities carry relatively low (implicit) rates of return even in an inflation-free economy, because underwriters cannot readily hedge against changes in the economy-wide rate of return. If the issuer has promised payments that imply a 4% annual return, a decline in the return of its portfolio below this figure produces bankruptcy. In order to reduce the bankruptcy risk, an issuer makes conservative assumptions about the return to investment. Conservative assumptions yield low returns—which in turn make annuities less

attractive compared with, say, mutual funds that deliver to investors the entire return of the portfolio.

The variable annuity responds to both of these problems. Instead of providing fixed payments, the variable annuity contract promises a modest guaranteed return (one low enough to curtail the bankruptcy risk) plus an additional amount to be determined in the future. Some variable annuities tie the level of return to a publicly-reported index—the inflation rate, for example. Another form of the variable annuity contract ties the amount the purchaser receives to the rate of return that the insurer earns on its investment portfolio. Although the purchaser of this type of variable annuity shares in the success of the insurer's investment portfolio, he also bears the risk of a disappointing performance.

■■■ No annuity transfers all of the risk to the seller. Any fixed annuity places on the buyer the risk that the seller's portfolio will perform too poorly to finance the promised payments. Section 3(a)(8) therefore necessarily exempts annuities that leave purchasers with some investment risk. If on the other hand a seller just pins the label "annuity" on a mutual fund, in which the buyer bears all of the risk, § 3(a)(8) is inapplicable. *SEC v. Variable Annuity Life Insurance Co.*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), holds that a contract providing for variable payments based on the investors' stakes in a special investment portfolio is not an "annuity contract". The Court reasoned that because there was no guarantee of *any* return, the entire investment risk was borne by the purchaser of the annuity. Where there is no transfer of risk, the exemption does not apply. *Id.* at 71–73, 79 S.Ct. at 621–23. *SEC v. United Benefit Life Insurance Co.*, 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), extended "no" to "slight", holding that § 3(a)(8) does not apply to an instrument permitting purchasers to share in the performance of an investment portfolio with a guaranteed but low minimum rate of return. These guaranteed rates were well below what would be provided in a conventional annuity, so

that the purchaser relied on the investment skills of the issuer to maintain earnings in excess of the contractual minimum. The Court thought that the dominant aspect of the instrument was that the seller acted as an "investment agency". *Id.* at 208, 87 S.Ct. at 1560.

How much risk is too much? The Court's opinions do not say, and the parties to our case debate the question vigorously. Our own decisions recognize that a minimal guarantee will not do the trick. *Peoria Union Stockyards Co. v. Pennsylvania Mutual Life Insurance Co.*, 698 F.2d 320 (7th Cir.1983), considered a contract providing that funds contributed by the purchaser would accumulate earnings at a modest guaranteed rate plus a pro rata share of the insurer's "divisible surplus", the amount earned on the insurer's general portfolio of investments. Relying on both *VALIC* and *United Benefit*, we held that Penn Mutual had sold its investment expertise and not an annuity; by leaving the bulk of the investment risk with the buyer, Penn Mutual disqualified the instrument from exemption under § 3(a)(8). See also *Otto*, 814 F.2d at 1140–42 (§ 3(a)(8) inapplicable when issuer has total control, after the fact, over the excess rate).

At first blush our case appears parallel to *Peoria Union*. AAP's contributions accumulated interest at the guaranteed minimum rates, plus the "excess" interest that Home Life's board of directors declared annually. This "excess", the parties agree, was derived from the rate of return Home Life earned on its general investment portfolio. Home Life stresses that by putting its entire portfolio behind the Flexible Annuity it reduced the buyers' risks—true enough, but equally true in *Peoria Union* and, for that matter, in any large mutual fund. A large, well-diversified portfolio has a small bankruptcy risk, but § 3(a)(8) does not carve out of the securities laws all investments that are safe in this sense. Many investments have negligible bankruptcy risk but are still securities. Compare *Reves* with *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982).

Yet one feature of the Flexible Annuity makes it look more like a fixed annuity than did the instruments in *Peoria Union* and *Otto*. In both of these cases (as in *VALIC* and *United Benefit*) the buyer paid money; the seller held it for a time, *after* which it announced the rate of interest to be credited. The *ex ante* uncertainty about that rate made the "annuity" look like a mutual fund, with the seller supplying only investment advice. Home Life, by contrast, announced the annual interest rate in advance. At the beginning of each policy year Home Life would declare a rate of return for the coming year. The terms of the Flexible Annuity left the purchaser free (a) to withdraw all funds and invest them elsewhere, if dissatisfied with the rate; (b) to leave the funds with Home Life and add nothing to them; and (c) to make additional purchases. AAP knew what rate of return it would earn for the next year not only before it made its initial contribution but also prior to deciding to "roll over" its investment each year thereafter. Had it found the declared rate unsatisfactory, it was free under the terms of the contract to take its money and go elsewhere. The Flexible Annuity, then, resembled nothing so much as a series of fixed annuities, each one year in duration, with the purchaser having an option to renew. That the return is fixed for such a short period does not make the instrument less an annuity.

AAP points out that if it had taken out its money during the first four years of the contract it would have incurred a withdrawal penalty. This front-end load covering sales and administrative expense did nothing to throw *investment* risk on the investor. (The same holds for any tax burden that might have befallen AAP had it demanded its money back.) AAP also argues that the Flexible Annuity provides no guarantee at all, that Home Life was free to change the interest rates at any time. *Otto* deemed such a reserved power fatal to the use of § 3(a)(8).

Although the group annuity contract issued to AAP states that the interest rate for contributions under the contract will be "declared annually by the Board of Di-

rectors", it does not expressly deny Home Life authority to modify the rate more than once a year. AAP submits that Home Life may alter interest rates at its discretion. In support of this claim, AAP points to the depositions of two of Home Life's officers describing how the Board of Directors arrived at the annual rate, and to a series of internal memoranda detailing the process by which the firm established interest rates for certain years. These documents show that Home Life did not assume a great deal of risk by guaranteeing an annual rate of return in advance: the declared rate was based on the performance of Home Life's portfolio over the past year, and only about 6% of the value of the portfolio was reinvested annually. The depositions and memoranda do not show, however, that Home Life varied during any year the interest rate for funds paid in prior to the declaration, or that it believed it had the authority to do so. In the early 1980s, when rates of return on other investments fluctuated rapidly, Home Life did begin to change more than once a year the rate of interest it would credit on *new* money. The rate declared on new funds was guaranteed through the remainder of the calendar year, but the changes in this rate did not affect the return on funds that had already been paid to Home Life in reliance on an earlier announcement. So far as this record reveals, then, Home Life neither claimed nor exercised the power to change rates after accepting funds, the power that spoiled the exemption in *Otto*, 814 F.2d at 1140–41.

The contract provides that interest rates are to be "declared annually" by Home Life's board of directors. This language most naturally means that the interest rates for amounts paid over to Home Life cannot be altered more than once per year. As the district court observed, this is how Home Life operated the Flexible Annuity program, and AAP has pointed to nothing in the voluminous record that suggests anything to the contrary. We therefore agree with the district court that Home Life's Flexible Annuities do not place excessive investment risk on the purchaser

and consequently are annuities. (State regulation is essential to the exemption under § 3(a)(8); Home Life is regulated in many states, and Rhode Island in particular regulated the Flexible Annuity. Nothing in § 3(a)(8) equates regulation with formal approval, so we make nothing of its absence.)

## III

Next we take up AAP's claims under ERISA. AAP believes that Home Life, HTNB, and others involved in the preparation and sale of the group annuity contract violated their fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104, by failing to reveal that HTNB would reap the benefits of the float in the triple-transfer system employed to leave HTNB as the formal purchaser. Defendants reply that they are not fiduciaries under ERISA and argue that even if they are they violated no duties. The district court concluded that none of the defendants is an ERISA fiduciary. We believe that both Home Life and HTNB are ERISA fiduciaries but that the record does not permit a conclusion that they violated the duties they owed as fiduciaries.

HTNB is a trustee, but not the trustee of an ERISA plan established by an employer and therefore not a "named fiduciary" under 29 U.S.C. § 1003(a). The ERISA *plan* is the one established by AAP. (Only a plan established by an "employer" is an ERISA plan. 29 U.S.C. § 1002(2)(A).) AAP's plan names the Schwarzes, not any of the defendants, as trustees. Even without being named, a person is a fiduciary with respect to an ERISA plan to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or, (iii) he has any discretionary authority ... in the administration of such plan." 29 U.S.C. § 1002(21). See *Forys v. United Food & Commercial Worker's International Union,* 829 F.2d 603 (7th Cir.1987). AAP argues that Home Life and HTNB are fiduciaries because they controlled the assets of AAP's defined benefit plan. But what are the plan's assets? Home Life placed AAP's contributions into its corporate portfolio, commingling them with, for example, the premiums paid for life insurance. Home Life has complete control over the composition of this portfolio and need not manage it to prefer pension claimants over the interests of insureds.

■ AAP argues that the defined benefit plan's assets included an equity interest in this investment portfolio to the extent of AAP's accumulated contributions and earnings, and consequently that Home Life's discretionary authority over these investments gives rise to a fiduciary duty. Yet § 401(b)(2) of ERISA provides that where a plan purchases a "guaranteed benefit policy" from an insurer, the assets of the plan include that policy but not an interest in any assets of the insurer. 29 U.S.C. § 1101(b)(2). A "guaranteed benefit policy" is an "insurance policy or contract ... [that] provides for benefits the amount of which is guaranteed by the insurer." 29 U.S.C. § 1101(b)(2)(B). We agree with the district court's conclusion that the Flexible Annuity is a guaranteed benefit policy because Home Life not only set fixed annual rates but also backed its promise with its full assets. It is difficult to see how an instrument could be an "annuity" for purposes of the securities laws and not be a "guaranteed benefit policy" for purposes of ERISA. Our discussion in Part II therefore establishes that Home Life was not holding its entire investment portfolio as AAP's fiduciary.

■ Still, the Flexible Annuity itself was an asset of AAP's plan. If HTNB and Home Life had discretionary authority over that instrument, they are ERISA fiduciaries. 29 U.S.C. § 1002(21)(A)(i). HTNB held the Flexible Annuity in trust for the benefit of AAP's defined benefit plan. All the authority over the *disposition* of the Flexible Annuity rested with the Schwarzes as trustees. HTNB's ministerial authority as holder of the paper does not create a fiduciary duty under ERISA. See *O'Toole v. Arlington Trust Co.,* 681 F.2d 94, 96 (1st Cir.1982). AAP points out that under Arti-

cle VI of the corporate plan trust HTNB retained the power to appoint a trust administrator, a position to which it appointed Home Life immediately after the declaration of the trust. Authority of this kind creates a fiduciary duty under ERISA. *Leigh v. Engle,* 727 F.2d 113, 133–35 (7th Cir.1984). *Leigh* observes, however, that the obligation as a fiduciary pertains only to the discretion thus created. See also, e.g., *Chicago Board Options Exchange, Inc. v. Connecticut General Life Insurance Co.,* 713 F.2d 254, 259 (7th Cir.1983); *Landry v. Air Line Pilots Ass'n International,* 901 F.2d 404, 417–18 (5th Cir.1990). So although HTNB is a "fiduciary", its obligation is only to use its limited discretion in the interest of the beneficiaries.

■ AAP claims that HTNB violated its duty to use contributions solely for the benefit of the plan. Home Life wired amounts it received from employers immediately to HTNB, which held them until the following Monday, obtaining as much as seven days' use of the money without paying interest to Home Life. Internal documents at Home Life pegged the total value of this float in 1980 at approximately $50,000 a year. Why this should be thought a breach of fiduciary duty eludes us. HTNB is entitled to compensation for its services as trustee. It contracted with Home Life to receive a portion of its compensation in the form of short-term interest-free use of funds. AAP concedes that Home Life began crediting contributions with interest from the day that the funds were received—exactly as would have occurred had HTNB not been an intermediary. Home Life, and not the purchasers, lost the value of the float, and the existence of the float therefore did not make it imprudent for HTNB to designate Home Life as the trust administrator (the only discretion it possessed).

■ Turning to Home Life, AAP argues that because Home Life retained the power to amend certain terms of the Flexible Annuity without the consent of the trustees of AAP's plan, it had discretionary control over the plan's asset and is a fiduciary. AAP relies on *Chicago Board Options Exchange,* 713 F.2d at 259–60, which held that an insurer's authority to amend the terms of an annuity contract purchased to fund a retirement plan makes it a fiduciary under 29 U.S.C. § 1002(21)(A). Once more, however, AAP's ability to establish that a defendant is a "fiduciary" does not aid its cause, for none of AAP's claims arises out of Home Life's exercise of this power. Cf. *Leigh,* 727 F.2d at 134. AAP's sole charge against Home Life is that it did not reveal the arrangements that allowed HTNB to profit from the float. That is unrelated to Home Life's power to amend the instrument. AAP suggests that if Home Life had not borne the costs of the float, its guaranteed rates of return would have been marginally higher. True enough: Home Life's costs of doing business reduced net returns payable to investors. Nothing makes the float stand out; the observation is equally true of *any* cost incurred in the administration of the Flexible Annuity. Although Home Life did not tell purchasers that HTNB was to enjoy the float, neither did it reveal its other costs of doing business—compensation to employees involved in administering the Flexible Annuity program, duplicating expenses, purchases of office equipment. None of these was calculated separately and stated to AAP and other investors, but all of them figured into the calculation of the rate of return. Home Life had no duty to calculate and disclose each expense of the Flexible Annuity program, so it violated no fiduciary duty by failing to inform AAP about the float.

■ AAP contends that two financial consulting firms specializing in designing pension plans, and their employees involved in designing AAP's defined benefit plan and recommending the Flexible Annuity to it, also violated their fiduciary duties under ERISA. These arguments are foreclosed by *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 535 (7th Cir.1991), which held that an actuary and his firm were not ERISA fiduciaries although they had performed misleading actuarial valuations of pension plan assets. In reaching this conclusion, we cited with approval a number of

cases holding that providers of professional services are not ERISA fiduciaries. See *Anoka Orthopaedic Associates v. Lechner*, 910 F.2d 514, 517 (8th Cir.1990) (lawyers and financial consultants); *Painters of Philadelphia District Council v. Price Waterhouse*, 879 F.2d 1146, 1149–51 (3d Cir.1989) (accountants); *Nieto v. Ecker*, 845 F.2d 868, 870–71 (9th Cir.1988) (lawyers). That lawyers, accountants, and actuaries may render services to employers, plan trustees, and plan beneficiaries does not give them any decision-making authority over the plan or plan assets; the power to act for the plan is essential to status as a fiduciary under ERISA.

## IV

■ At last we arrive at AAP's RICO claims, which these days seem to be tacked onto securities and ERISA complaints as a matter of course. They should not be. Plaintiffs in a RICO action must show a "pattern" of racketeering, entailing proof of at least two of the felonies the statute specifies as predicate acts. 18 U.S.C. § 1961(1). AAP's claims center on the float, which is no felony no matter what the outcome of AAP's fiduciary arguments. AAP characterizes Home Life's arrangement with HTNB both as an unlawful "kickback" (18 U.S.C. § 1954) and as "embezzlement" of AAP's funds (18 U.S.C. § 664). These arguments brought a little mirth to a complex case—but we suppose this was not the effect AAP sought.

Section 1954 makes it unlawful for a person to receive "any … kickback … because of or with intent to be influenced with respect to, any of his actions … relating to any question or matter concerning [an employee benefit] plan." The text of § 1954 excludes "payment to or acceptance by any person of bona fide salary, compensation, or other payments made for goods or facilities actually furnished or for services actually performed." The district court correctly observed that "to label Home Life's payment of an additional fee to HTNB in the form of the float a 'kickback' is to ignore the substance of the transaction. Funds are not kicked back when two

independent entities agree between themselves as to the payment to be made for services rendered". 751 F.Supp. at 729. Nothing so much as hints that HTNB received the float as an inducement to perform some illegitimate act, so there is no "kickback". Cf. *Ranke v. United States*, 873 F.2d 1033, 1038–39 (7th Cir.1989).

■ AAP's cry of embezzlement is equally silly. Embezzlement occurs when a person who has lawfully received funds wilfully diverts them to his own unauthorized use. *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986). Because the float arrangement was consensual between Home Life and HTNB, the bank was hardly embezzling Home Life's money.

■ Reduced to the mundane, AAP asserts that Home Life, HTNB, and the many actuaries, lawyers, and financial consultants involved in the transactions all committed wire and mail fraud. 18 U.S.C. §§ 1343, 1341. To show the "fraud" part of mail and wire fraud, AAP offers the affidavit of Dr. Schwarz, who states that he was assured that the Flexible Annuity offered rates of return equal to the highest in the market. This assertion is weird, for recall that to make the plan a more effective tax shelter Schwarz had to find an instrument with a relatively low rate of return. Let that pass. Fraud occurs only when a person of ordinary prudence and comprehension would rely on the misrepresentations. *Teamsters Local 282 Pension Trust Fund v. Angelos*, 762 F.2d 522, 529–30 (7th Cir.1985). No prudent person would treat as gospel statements such as those Schwarz alleges were made to him. Statements that a certain investment will earn the "highest" rate of return are puffery. *Reynolds v. East Dyer Development Co.*, 882 F.2d 1249 (7th Cir.1989). The relation between the rates offered on the Flexible Annuity and those available on other investments can be checked by a quick look at the *Wall Street Journal* or the *Chicago Tribune*. See *Blount Financial Services, Inc. v. Walter E. Heller & Co.*, 819 F.2d 151 (6th Cir.1987) (misleading statements regarding bank's prime rate cannot be fraud where such information is

publicly available). Any statement or implication that the Flexible Annuity provided that all earnings on Home Life's investments would be credited to AAP is refuted by the Flexible Annuity contract and the sales literature, which promise a guaranteed rate of return plus an excess in the discretion of Home Life. Documents that unambiguously cover a point control over remembered (or misremembered, or invented) oral statements. *Zobrist v. Coal-X, Inc.*, 708 F.2d 1511 (10th Cir.1983). "Unambiguously" is an important qualification, *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322, 1325 (7th Cir.1988); cf. *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 2760–61, 115 L.Ed.2d 929 (1991), but one satisfied here. We agree with the district court that no jury could find that a reasonable investor would be misled by the statements Schwarz related, when the truth was under his nose in black and white (many times over). AAP cannot establish any predicate act, so the district court properly entered summary judgment on the RICO claims.

AFFIRMED.