Rothwell v. Chubb                    CV-96-83-B      03/31/98

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


<u>Donald E. Rothwell, et al.</u>

   v.                                              Civil No. 96-83-B

<u>Chubb Life Insurance</u>
<u>Company of America</u>


## MEMORANDUM AND ORDER


Donald Rothwell, Joseph Buddemeyer, Florence Landau, and Stanley Landau charge in their class action complaint that Chubb Life Insurance Company of America ("Chubb") implemented a scheme to induce prospective policyholders to purchase interest-sensitive whole life or universal life insurance policies through the use of fraudulent and deceptive sales practices.  Two of plaintiffs' claims are based on alleged violations of the Securities Act of 1933, 15 U.S.C.A. § 77 <u>et</u> <u>seq.</u> (West 1997). Chubb seeks summary judgment with respect to both claims, arguing that the policies at issue are not regulated as securities under the Act.  As I agree, I grant the motion for partial summary judgment.[1]

---

[1]  I address plaintiffs' motion for class certification in a separate order.

## I.

The insurance policies at issue in this case require the policyholder to pay a set premium in exchange for Chubb's promise to pay a guaranteed death benefit. For example, plaintiff Rothwell's policy guarantees him a $50,000 death benefit for the first five years and a death benefit of at least $21,869 for each year thereafter in exchange for an annual premium of $832. Premium payments, after the cost of insurance and various other charges are deducted, are credited to a "Fund Account," the balance of which grows over time. The Fund Account earns interest at a rate guaranteed for the first year. Although Chubb thereafter may adjust the interest rate up or down, the rate may not fall below a guaranteed minimum level.

The Fund Account serves several functions. A policyholder may borrow against the Account or reclaim the balance in the Account, less any surrender charge, by canceling the policy. As the balance in the Account grows over time, the additional amount required to satisfy the specified death benefit correspondingly diminishes, reducing the policyholder's cost of insurance. Depending upon the value of the Account and the designated interest rate, the Account may generate sufficient interest to reduce or even eliminate the need for additional out-of-pocket premium payments. Alternatively, after the initial

period during which the maximum death benefit is guaranteed, Chubb may reduce the death benefit if the interest generated on the Account is not sufficient in conjunction with the premium payments to fully cover the cost of insurance.[2]

Plaintiffs' primary argument is that Chubb adopted a practice of encouraging its agents to make misleading statements to prospective policyholders concerning the point at which the interest generated on the Fund Account would be sufficient to eliminate the need for future out-of-pocket premium payments. According to the complaint, Chubb sold its policies through the use of computer-generated illustrations demonstrating this "vanishing premium" feature. These illustrations, tailored to the individual financial situation of each prospective policy-holder, predicted the performance of the policy based on an assumed interest rate. The rate assumed in the illustrations typically was the initial rate guaranteed in the first year, but in no event was it greater than the rate at which Chubb had

_____

[2] In the event that the interest earned on the Fund Account is insufficient in conjunction with the premium payments to cover the cost of insurance, the policyholder also has the option of either retaining the initial death benefit by paying a higher premium payment or, if the value of the Fund Account is above a specified level, paying the initial premium amount, retaining the initial death benefit, and making up the difference from principal.

credited policies in the previous year. The illustrations showed that if the interest rate Chubb used in crediting the Fund Account remained at the assumed level, the policyholder's out-of-pocket premium payments would cease after a given term of years and the policyholder's death benefit would remain for the life of the policy at the level guaranteed for the first five years.

Plaintiffs contend that such illustrations were uniformly misleading in that they failed to adequately disclose, inter alia that: (1) the assumed interest rates were unrealistically high; (2) incremental changes in the assumed interest rates could extend the "vanish year"; (3) a significant change in the assumed rate could mean that the "vanish year" would never be reached; and (4) changes in other undisclosed assumptions could require the policyholder to continue making premium payments for many years after the "vanish year" depicted in the illustrations. Plaintiffs also claim that Chubb's agents failed to make additional disclosures that were necessary to render the illustrations not misleading.

Plaintiffs also allege that Chubb orchestrated a "churning" scheme by which it induced thousands of persons who already owned life insurance to use the accumulated cash value in their

existing policies to purchase new policies with Chubb. Chubb's agents allegedly represented to policyholders that by using the accumulated cash value in their existing policies, they could obtain new policies offering greater coverage with no additional premium outlays. In many cases, however, the cash values borrowed or taken from the pre-existing policies proved insufficient to cover the premiums for the new policies. Rather, many policyholders had to make additional premium payments, often in increased amounts, in order to maintain coverage. Additionally, policy replacement often entailed significant undisclosed administrative fees and sales commissions.

Plaintiffs contend that the life insurance policies at issue in this case are unregistered securities sold in violation of section 12(1) of the Securities Act. Section 12(1) states that "any person who offers or sells a security in violation of [the Act's registration provisions] . . . shall be liable . . . to the person purchasing such security from him." 15 U.S.C.A. § 77l(1). Additionally, plaintiffs contend that in using deceptive sales practices to sell these "securities," Chubb violated section 12(2) of the Securities Act, which makes liable any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a

5

material fact or omits to state a material fact necessary in order to make the statements . . . not misleading."  15 U.S.C.A. § 77l(2).

In order to establish that plaintiffs are entitled to relief under these provisions, they must demonstrate that the insurance policies they purchased are "securities" as defined by the Securities Act.  Contending that plaintiffs' insurance policies are not securities, Chubb moves for summary judgment on both Securities Act claims.

## II.

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323, 327 (1st Cir. 1996).  A genuine issue is one "that properly can be resolved only by a finder of fact because [it] . . . may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  A material fact is one that affects the outcome of the suit.  Id. at 248.  In ruling on

6

a motion for summary judgment, the court construes the evidence in the light most favorable to the non-movant and determines whether the moving party is entitled to judgment as a matter of law.  Oliver v. Digital Equip. Corp., 846 F.2d 103, 105 (1st Cir. 1988).

Where the nonmoving party bears the burden of persuasion at trial, it must "make a showing sufficient to establish the existence of [the] element[s] essential to [its] case" in order to avoid summary judgment.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  It is not sufficient to "rest upon mere allegation[s] or denials of [the nonmoving party's] pleading."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson, 477 U.S. at 256).  Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the nonmoving party."  Id. at 842 (internal citations omitted).

Plaintiffs argued in their objection to Chubb's summary judgment motion that summary judgment should be denied both because issues of material fact remain in genuine dispute and because the motion is premature in that they have not yet had discovery on the merits of their claims.  At oral argument, however, plaintiffs' counsel was given the choice of meeting

7

defendant's motion head-on or making a motion for further discovery pursuant to Fed. R. Civ. P. 56(f). At that time, plaintiffs waived any recourse to Rule 56(f). Therefore, I consider whether plaintiffs' proffer as to the security status of their life insurance policies is sufficient to withstand summary judgment.[3]

## III.

### A. LAW

#### 1. The Securities Act

The Securities Act omits any reference to insurance policies when defining the term "security." See 15 U.S.C.A. § 77b(a)(1). This omission is no oversight, as section 3(a)(8) of the Securities Act expressly exempts from treatment as a security "[a]ny insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the

---

[3] The fact that a motion for class certification is pending does not prevent me from ruling on the summary judgment motion before determining whether to certify the class. "'There is nothing in Rule 23 which precludes the court from examining the merits of plaintiff[s'] claims on a proper . . . Rule 56 motion for summary judgment simply because such a motion' precedes resolution of the issue of class certification." Schweizer v. Trans Union Corp., No. 97-7542, 1998 WL 49163, at * 5 (2d Cir. Jan. 26, 1998) (quoting Lorber v. Beebe, 407 F. Supp. 279, 291 n.11 (S.D.N.Y. 1976)); Thompson v. County of Medina, 29 F.3d 238, 240-41 (6th Cir. 1994).

supervision of the insurance commissioner . . . of any State or Territory of the United States or the District of Columbia." Id. § 77c(a)(8). As Congress explained, section 3(a)(8) "makes clear what is already implied in the act, namely that insurance policies are not to be regarded as securities subject to the provisions of the act. The entire tenor of the act would lead, even without this specific exemption, to the exclusion of insurance policies from the . . . act." H.R. 73-85, at 15 (1933).[4]

---

[4] The Securities Act's anti-fraud provisions, sections 12(2) and 17, expressly provide that they apply to even those instruments exempt under section 3. 15 U.S.C.A. §§ 77l(2), 77q(c). Since the Securities Act's enactment, however, Congress, the SEC, courts, and commentators have taken the view that section 3(a)(8) is surplusage that merely reiterates what section 2(1) implies, that insurance policies are not securities for any purpose under the Act. See, e.g., Tcherepnin v. Knight, 389 U.S. 332, 342 n.30 (1967) ("[T]he exemption from registration for insurance contracts was clearly supererogation.") (citing SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 74 n.4 (1959)); Berent v. Kemper Corp., 780 F. Supp. 431, 440-41 (E.D. Mich. 1991) ("Insurance policies that come within Section 3(a)(8) are excluded from the anti-fraud provisions of all federal securities laws."); Louis Loss & Joel Seligman, Fundamentals of Securities Regulation 208 (3d ed. 1994) ("[T]he [SEC] early on took the position that insurance . . . policies were not intended to be securities, and that in effect § 3(a)(8) is supererogation."); Securities Act Release No. 33-6558, 49 Fed. Reg. 46750, 46753 (Nov. 28, 1984) ("[T]here can be no serious question that Congress intended any insurance contract . . . falling within section 3(a)(8) . . . to be excluded from all provisions of the Act, notwithstanding the plain language of the Act that section 3(a)(8) is an 'exemption' from the registration but not the antifraud provisions."). Consequently, I use the same standards

The Supreme Court has explained that the exclusion of insurance policies from coverage reflects that, at the time the Securities Act was passed, there was

> a form of "investment" known as insurance (including "annuity contracts") which did not present very squarely the sort of problems that the Securities Act . . . (was) devised to deal with, and which were, in many details, subject to a form of state regulation of a sort which made the federal regulation even less relevant.

SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 210 (1967) (quoting SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 75 (1959) ("VALIC") (Brennan, J., concurring)). Since that time, the insurance industry has grown increasingly dynamic, offering new products that resemble securities more closely than the traditional forms of insurance. See VALIC, 359 U.S. at 75-6 (Brennan, J., concurring). Accordingly, simply labeling as "insurance" what otherwise would be considered a security is not sufficient to ensure an instrument's exemption from the provisions of the Act. Id.; Associates in Adolescent Psychiatry v. Home Life Ins. Co., 941 F.2d 561, 566 (7th Cir. 1991), cert. denied, 502 U.S. 1099 (1992) ("Associates"). Rather, for a novel insurance product to avoid security status as an exempt "insurance policy", it must resemble the sort of investment form

_____

to evaluate both plaintiffs' section 12(1) and 12(2) claims.

10

that Congress intended to exclude from coverage.  United Benefit, 387 U.S. at 210; VALIC, 359 U.S. at 75 (Brennan, J., concurring).

The Supreme Court first squarely addressed this subject in VALIC.  At issue was a type of variable annuity contract under which purchasers' premium payments were pooled in a separate fund and invested.  359 U.S. at 69.  Purchasers were entitled to a pro rata share of the Fund which, as the Court noted, "may be a lot, a little, or nothing" depending upon the success of the issuer's investment strategy.  Id. at 71.  Because the issuer assumed no risk under the variable annuity contract, the Court held that the contract was not exempt from regulation under the Securities Act. Id.

The Court next ruled in United Benefit that an insurer cannot exempt a variable annuity contract from regulation under the Securities Act merely by providing a low guaranteed minimum rate of return.  387 U.S. at 212.  In that case, the issuer pooled purchasers' premium payments in a separate fund for investment but guaranteed purchasers a low minimum rate of return.  Id. at 205-06.  Whether a purchaser could receive payments above the guaranteed rate depended upon the fund's investment success and could not be determined until after the purchaser's right to recovery matured.  Id.  In holding that the

annuity was subject to regulation as a security, the Court stated that because the annuity's guaranteed rate of return was substantially lower than those guaranteed by conventional annuities, purchasers essentially relied on the investment skill of the issuer to provide the bulk of the return.  Id. at 209-09. Finding that the contracts thus were devised to appeal to the purchaser not on "the usual insurance basis of stability and security but on the prospect of 'growth,'" the Court concluded that the annuity was not exempt from coverage under the Act. Id. at 210-11.

    2.  SEC Safe Harbor

In 1986, the SEC adopted Rule 151, creating a "safe harbor" that codified the existing state of the law under section 3(a)(8).[5]  Securities Act Release No. 33-6645, 51 Fed. Reg. 20254 (May 29, 1986); Thomas L. Hazen, The Law of Securities Regulation § 4.9, at 198 (3d ed. 1995).  Although the rule is directed at annuities, it applies with equal force to insurance policies.

---

[5] Rule 151 does not establish "an all-inclusive definition purporting to encompass every annuity [or insurance contract] that falls within the section 3(a)(8) exclusion."  Securities Act Release No. 33-6645, 51 Fed. Reg. at 20255.  Rather, the rule defines a class of instruments that the SEC believes to be clearly covered by section 3(a)(8).  Id.  Consequently, even a contract that does not fall precisely with the scope of Rule 151 may still be exempted from treatment as a security under section 3(a)(8).  Id.

Securities Act Release No. 33-6645, 51 Fed. Reg. at 20255 n.4. Under Rule 151, an annuity or insurance policy is exempt under section 3(a)(8) if: (1) the contract is issued by an insurer subject to the supervision of the applicable state insurance department; (2) "the insurer assumes the investment risk under the contract"; and (3) the contract "is not marketed primarily as an investment." 17 C.F.R. § 230.151(a)(1)-(3) (1997). The insurer is said to assume the investment risk if: (1) "the value of the policy does not vary according to the investment experience of a separate account"; (2) the insurer guarantees the premium payments and credits the account at an interest rate at least equal to the minimum rate required by state law; and (3) the insurer guarantees that it will not change the rate of interest to be credited in excess of the minimum guaranteed rate more frequently than once per year. Id. § 230.151(a)(2) & (b)(1)-(3).

Because plaintiffs' policies were issued prior to the promulgation of Rule 151, the rule does not control the disposition of this case. See Associates, 941 F.2d at 565 ("Only persons who rely on a regulation may claim benefit of its safe harbor."). Rather, I decide this case based on section 3(a)(8) and interpretive case law. See id. Because the SEC promulgated

13

Rule 151 in response to, and as a codification of, the case law interpreting section 3(a)(8), however, reference to the rule may facilitate my analysis. See id.; Otto v. Variable Annuity Life Ins. Co., 814 F.2d 1127, 1133 (7th Cir. 1986); Securities Act Release No. 33-6645, 51 Fed. Reg. at 20261 ("The rationale underlying the conditions set forth in [Rule 151] is relevant to any section 3(a)(8) determination.").

B.   **ANALYSIS**

The policies at issue address two types of risk: insurance risk and investment risk. The insurance risk, the risk that the policyholder will die prematurely, is born entirely by Chubb. Chubb accounts for this risk in the traditional manner by using actuarial calculations about life expectancy to determine the cost of a given amount of insurance for a particular insured. The investment risk, the risk that principal will be lost and/or that the return on investment will be lower than expected, is shared by Chubb and its policyholders. Chubb guarantees principal, provides a minimum guaranteed rate of return, specifies a guaranteed excess interest rate for the first year that the policy is in effect, and agrees thereafter to announce changes in the excess rate prospectively. Chubb's policyholders assume the risk that the excess interest rate will fall after the first

14

year.[6]  The question thus presented is whether the interest risk retained by Chubb's policyholders is sufficient, in view of the other risks born by Chubb, to prevent the policies from being considered under the Securities Act's insurance exemption.  The answer to this question is no.

Chubb's policies have three attributes that lead me to the conclusion that they are not subject to regulation under the Securities Act.  First, the policies guarantee a minimum interest rate of 4%.  Although this rate is relatively low, it exceeds the minimum rate required by the nonforfeiture laws of the states in which plaintiffs purchased their policies, see Md. Code Ann., Ins., § 16-504 (WESTLAW through 1997 Sess.) (requiring minimum rate of 3%); NY Ins. Law § 4223 (McKinney, WESTLAW through 1997 Sess.) (same), as well as the minimum rate required for individual annuity contracts by the National Association of Insurance Commissioners Standard Nonforfeiture Law, see NAIC 805-1 (WESTLAW 1997).  Accordingly, the 4% rate is consistent with

---

[6]  The policies at issue authorize Chubb to adjust the death benefit after a period of time if the premium payments plus the interest generated on the Fund Account do not generate sufficient income to fund the cost of the initial death benefit.  This policy feature does not shift any insurance risk onto the policyholder.  Rather, it merely reflects the fact that reductions in the interest rate paid on the Account could impair the ability of the Account to generate sufficient interest to fund the cost of the initial death benefit.

the minimum guaranteed rate required by Rule 151's safe harbor. See 17 C.F.R. § 230.151 (b)(ii) and (c).

Second, Chubb assumes significant investment risk by declaring any changes to the excess interest rate only prospectively. Annuity contracts such as those at issue in VALIC and United Benefit, where the insurer holds the policyholders' money for a time before announcing the interest rate at which it will credit the money, permit an insurer to reflect upon its investment experience and set the rate so that its payment obligations will not exceed its own investment return. See Associates, 941 F.2d at 566-67 (citing Otto, 814 F.2d at 1140-42; Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co., 698 F.2d 320, 324-25 (7th Cir. 1983)). Under such an arrangement, the insurer truly does shift the investment risk to the policyholders. See id.; Harper-Wyman Co. v. Connecticut Gen. Life Ins. Co., No. 86 C 9595, 1991 WL 285746, at *4 (N.D. Ill. Dec. 23, 1991). The policies at issue in this case, however, require Chubb to predict the future performance of its investments and prospectively set the rate at which it will credit the Fund Accounts. Once Chubb has declared an interest rate, it assumes the risk that, despite its predictions, its investments will not perform sufficiently to meet its obligation

16

to pay at the declared rate.  See Associates, 941 F.2d at 567; Harper-Wyman, 1991 WL 285746, at *4.  Additionally, advance notice of rate changes gives plaintiffs a meaningful opportunity to assess whether they wish to continue to hold their policies. See Associates, 941 F.2d at 567.  This arrangement thus limits the extent to which investment risk is placed upon the policyholders.  See id.

Finally, Chubb has offered unrebutted evidence that it does not change the excess interest rate more frequently than once per year.[7]  Consequently, these are not policies under which the insurer shifts investment risk onto the policyholder by exercising unfettered discretion to continually adjust the

---

[7]  Nowhere in plaintiffs' policies is Chubb expressly barred from changing the excess interest rate more frequently than once per year.  Consequently, the security status of the policies under Rule 151 is questionable.  See 17 C.F.R. § 230.151(b)(3) (safe harbor applies only where insurer guarantees it will not change excess rates more frequently than once per year).  Chubb has submitted evidence, however, that in practice it does not change the excess interest rate more frequently than once per year.  Plaintiffs offer nothing to rebut this showing. Consequently, the only reasonable inference the current state of the evidence permits is that Chubb does not, in fact, change the excess interest rate on plaintiffs policies more frequently than once per year.  See Anderson, 477 U.S. at 250 (to withstand summary judgment, non-movant must set forth evidence that would enable finder of fact to find in its favor); LeBlanc, 6 F.3d at 841.

interest rate so as to ensure that its investment returns are always sufficient to cover its obligations. See Associates, 941 F.2d at 567-68; Otto, 814 F.2d at 1140-42; Securities Act Release No. 33-6645, 51 Fed. Reg. at 20258. Rather, when Chubb declares a new excess interest rate, it expressly assumes the risk that its investments will earn insufficient income over the next year to cover its obligations. See Associates, 941 F.2d at 567. Given this feature, the policies do not place excessive investment risk on plaintiffs. See id.; Berent v. Kemper Corp., 780 F. Supp. 431, 443 (E.D. Mich. 1991); Securities Act Release No. 33-6645, 51 Fed. Reg. at 20258.

Both sides agree that Chubb is subject to regulation by the insurance commissioners of the states in which it issued its policies. Further, the undisputed evidence demonstrates that Chubb has assumed all of the insurance risk and most of the investment risk arising from the policies at issue. Although the policies leave the policyholder with the risk that Chubb will lower the excess interest rate after the first year, that risk is tempered by an adequate minimum guaranteed interest rate and by the knowledge that the interest rate will be adjusted only prospectively and not more frequently than once a year. Under these circumstances, the policies do not place excessive investment

18

risk on the policyholder.  Nor will the record permit a finding that the policies at issue were devised to be sold primarily as an investment.  Accordingly, the policies are exempt from regulation under the Securities Act.

## IV.

For the reasons stated herein, I grant Chubb's motion for partial summary judgment (document no. 50).

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

March 31, 1998

cc:  Paul Maggiotto, Esq.
     Peter Lagorio, Esq.
     Mark Weaver, Esq.
     Jeffrey Barist, Esq.
     Charles J. Piven, Esq.
     Richard S. Schiffrin, Esq.
     Michael D. Craig, Esq.