Edward C. FECHTER, Evelyn Hoffman, and Roderick M. Jackson, individually and on behalf of all others similarly situated,

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY.**

Civ. A. No. 87–0506.

United States District Court, E.D. Pennsylvania.

Aug. 20, 1992.

Richard F. Stevens, Joseph A. Bubba, Allentown, Pa., for plaintiff.

Paul A. Fischer, James F. Jorden, Washington, D.C., for defendant.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This matter is before us for a non-jury trial. Defendant Connecticut General Life Insurance Company has moved for judg-

ment on partial findings of fact pursuant to Fed.R.Civ.P. 52(c). By way of background, we briefly describe the procedural history of this action, now in its fifth year of litigation.

This ERISA[1] case involves the 1984 termination of the HMW Industries, Inc. Cooperative Retirement Income Plan for Salaried Employees (the "Plan"), a forty year old pension plan which was grossly overfunded at the time of its termination. Upon termination, eighty-three percent (83%) of the Plan's surplus assets reverted to the company, HMW Industries, Inc., its subsidiary Hamilton Technology, Inc., and its parent Clabir Corporation. The remaining assets, seventeen percent (17%) of the Plan's surplus, were distributed to the Plan participants. Plaintiffs, a group of approximately 650 current and former salaried employees of HMW Industries, Inc. and Hamilton Technology, Inc., filed this class-action[2] under ERISA, challenging the disproportionate distribution of assets in favor of their employer. We have original jurisdiction over plaintiffs' claims pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331.

On January 21, 1987, plaintiffs initiated this action against HMW Industries, Inc., Hamilton Technology, Inc., Clabir Corporation, and key management personnel[3]. One and one-half years later, following this Court's entry of a preliminary injunction, defendant's appeal of that injunction to the Third Circuit Court of Appeals, and a six-day non-jury trial, plaintiffs settled all their claims against each of these original defendants for $2.825 million. See Fechter v. HMW Industries, Inc., 879 F.2d 1111 (3d Cir.1989); HUYETT, J., Order Granting Plaintiffs' Motion for Preliminary Injunction, dated March 3, 1989, docket entry no. 93; HUYETT, J., Order, dated July 3, 1989, docket entry no. 199; HUYETT, J., Stipulation and Agreement, dated, July 3, 1989, docket entry no. 201; CAHN, J., Order, dated July 21, 1989, docket entry no. 220; Defendant's Post–Discovery Motion for Summary Judgment, Ex. 45, docket entry no. 261.[4]

During settlement negotiations with the Original Defendants, plaintiffs amended their complaint adding the Plan's insurance company and actuary, Connecticut General Life Insurance Company ("Connecticut General"), as a party-defendant. (Second Amended Complaint, filed July 19, 1989, docket entry no. 210). For purposes of clarity, plaintiffs further amended their complaint eliminating references to the Original Defendants. (Plaintiffs' Third Amended Complaint ("Complaint"), filed July 9, 1990, docket entry no. 242). In October 1991, this Court denied the parties' cross-motions for summary judgment finding, inter alia, that due process would require, at a minimum, that plaintiffs prove their case against Connecticut General based on a record and proceedings for which Connecticut General had been given a full opportunity to participate, rather than relying on the record adduced in the district court and Third Circuit proceedings prior to the time that Connecticut General was joined as a party to this action. (VAN ANTWERPEN, J., Order of October 8, 1991, docket entry no. 285). Thereafter, on June 30, 1992 through July 1, 1992 this non-jury matter[5] proceeded to trial in Ea-

---

1. Employees Retirement Income Security Act, Pub.L. 93–406, Title I, § 2, 88 Stat. 832 (1974) codified at 29 U.S.C.A. § 1001 et seq. (West 1985).

2. Plaintiffs class was certified pursuant to Fed. R.Civ.P. 23 by Order of this Court on May 31, 1988. (HUYETT, J., Order, dated May 31, 1988, docket entry no. 53).

3. As individual defendants, plaintiffs named Gloria Strantz, former manager of benefits at HMW Industries, Inc., Kenneth Bernhardt, president of Hamilton Technology, Inc., and Henry Clarke, president of Clabir Corporation.

4. On March 23, 1990, the Honorable Daniel H. Huyett, 3d recused himself, and this matter was transferred to the Honorable Franklin S. Van Antwerpen. The recusal was necessary because Tyron, Freedman and Espenshade (local counsel for the Original Defendants) merged with Stevens & Lee, the firm that employs Judge Huyett's son.

5. On May 26, 1989, this Court determined pursuant to Fed.R.Civ.P. 38 that plaintiffs' ERISA claims for the recovery of surplus pension fund assets are not triable to a jury. (HUYETT, J., Order of May 26, 1989, docket entry no. 163).

ston, Pennsylvania against the only remaining defendant Connecticut General.

In light of the extensive documentation in this case and since Connecticut General can only be liable to plaintiffs under their theories if plaintiffs prove that Connecticut General was an ERISA "fiduciary," [6] the trial against Connecticut General proceeded on a bifurcated basis. On the third day of trial, plaintiffs rested on the issues of liability, and defendant Connecticut General moved for judgment on partial findings of fact pursuant to Fed.R.Civ.P. 52(c). Plaintiffs offered more than 130 exhibits,[7] the testimony of John Markley and Gloria G. Strantz, and the deposition of David W. Greene [8] into evidence. Also in evidence is Exhibit B to Plaintiffs' Reply Brief in Further Opposition to Defendant's Motion For Judgment On Partial Findings.[9] Collectively, this evidence constitutes the record for this stage of the proceeding. On July 2, 1992, the Court ordered the parties to submit Proposed Findings of Fact, Conclusions of Law, and Memoranda in support of and

in opposition to defendant's motion. In addition, both parties have filed reply briefs.[10] The Court further ordered that the parties would be limited at this stage to the issues and facts put forth in these submissions. Pursuant to Fed.R.Civ.P. 52(c) we make the following findings of fact and conclusions of law with regard to plaintiffs' evidence.

## FINDINGS OF FACT

### I. BACKGROUND

#### A. The Parties

1. This class-action involves the 1984 termination of the HMW Industries, Inc. Cooperative Retirement Income Plan (the "Plan"), a pension plan established in 1940, by HMW Industries, Inc., formerly the Hamilton Watch Company.[11] The Plan covered salaried employees of HMW Industries, Inc. and its various subsidiaries, including Hamilton Technology, Inc. (Pls.'

---

6. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This term is extensively discussed *infra* at pp. 196–197.

7. Plaintiffs' exhibits 1–51, 54, 55, 57–87, 89–98, 102, 103, 105–112, 115, 117–122, 137, 143, and 145–148 are in evidence. Plaintiffs' exhibit 142 (excerpts from the deposition of Mr. Hugh Hardcastle) was also admitted, pursuant to Fed. R.Evid. 801(d)(2)(a), to the extent that Mr. Hardcastle testified as a fact witness concerning his own and Connecticut General's conduct at Plan termination. (7/2/92 Tr. at 16–21.) Plaintiffs have reserved the right to introduce additional exhibits should this trial proceed on the statute of limitations and damages issues.

8. The entire deposition of David W. Greene, plaintiffs' expert, was admitted into evidence subject to certain evidentiary limitations as discussed below where relevant. See Finding 16 n. 11. (7/2/92 Tr. at 21–23).

9. Although they have rested, plaintiffs submitted three exhibits by way of attachment to their Reply Brief In Further Opposition to Defendant's Motion For Judgment On Partial Findings. (Hereinafter, Pls.' Exs. A, B, C, respectively). Pls.' Ex. A and portions of Pls.' Ex. C were admitted into evidence at trial and are already properly before this Court. (Pls.' Ex. 87). Pls.' Ex. B was marked as Def.'s Ex. 709 at trial and relied upon heavily by defendant on cross examination. Taken together, we deem plaintiffs' attachment of Pls.' Ex. B and strong reliance thereon at pages 8–13 of their Reply Brief as a

motion to re-open the record and introduce Pls.' Ex. B as part of their case-in-chief. Given defendant's use of the exhibit at trial, defendant can have no objections to it admittance. Therefore, in fairness to plaintiffs, we receive Pls.' Ex. B into evidence at this time.

With regard to Pls.' Ex. C, defendant did not have an opportunity to object to or to cross examine witnesses with respect to those portions of Pls.' Ex. C which were not previously admitted into evidence. Accordingly, we cannot permit the admission of the remaining portions of Pls.' Ex. C. Even if we were to admit these portions, there is no evidence that Connecticut General was responsible for their preparation. See infra n. 13.

10. Upon receipt of the parties post-trial submissions, the Court granted Plaintiffs' leave to file a Reply Brief in Opposition to Defendant's Motion. In rebuttal to plaintiffs Reply Brief, defendant filed, without leave of the Court, a Statement of Clarification, amounting in essence to its own reply brief. While the Court does not ordinarily accept reply brief's without leave of the Court, given the importance of the fiduciary issue to plaintiffs' claims, we accept defendant's Statement of Clarification at this time, and deny plaintiffs' Motion to Preclude Consideration of the same.

11. In 1972, Hamilton Watch Company changed its name to HMW Industries, Inc. (Complaint ¶ 8; Def.'s Proposed Finding ¶ 4).

Ex. 39 at 1–2). Hereinafter, unless the context indicates otherwise, HMW Industries, Inc. and its subsidiary, Hamilton Technology, Inc., are jointly referred to as "HMW". Clabir Corporation ("Clabir") acquired HMW in October 1983. (Complaint, ¶ 9; Def.'s Proposed Finding ¶ 4).

2. The plaintiff class consists of all employees of HMW Industries, Inc. and Hamilton Technology, Inc. who were participants in the Plan on March 31, 1984, and all retired employees of such entities who retained employee contributions in the Plan on March 31, 1984. The named plaintiffs are Edward C. Fechter, Evelyn C. Hoffman, and Roderick M. Jackson. (HUYETT, J., Order, dated May 31, 1988, docket entry no. 53).

3. Defendant Connecticut General Life Insurance Company ("Connecticut General") is a Connecticut insurance company licensed to do an insurance business in the State of Pennsylvania.

### B. The HMW Plan

4. The HMW Plan was a defined benefit, contributory retirement plan, meaning that: (a) the Plan provided fixed, or "defined" benefits to participants based on criteria set forth in the Plan; (b) the participants were required to contribute between 2% and 4% of their salaries; and (c) the employer was required to contribute whatever amounts over and above employee contributions were necessary to provide the fixed benefits and maintain the Plan on a sound actuarial basis. (Pls.' Ex. 22; Pls.' Ex. 39). Because the Plan was over-funded, HMW did not have to make any contributions to the Plan during the last five years of its existence. (Pls.' Exs. 76–79; Pls.' Exs. 84–87; Pls.' Ex. 89).

5. HMW Industries, Inc. and Hamilton Technology, Inc. jointly and severally were Employers and Plan Sponsors for the Plan. (Pls.' Ex. 39 at 2). HMW Industries, Inc. was the Plan Administrator and named fiduciary for the Plan. (Pls.' Ex. 39 at 36). Gloria Strantz, a member of the plaintiff class, held the position at HMW of Manager of Employee Benefits, and in that position she had the duty and responsibility to

assist the Plan Administrator in carrying out its responsibilities. (Pls.' Ex. 39 at 36; 7/1/92 Tr. at 53–54, Strantz Direct).

### C. The Contract

6. As a funding vehicle for the Plan, HMW entered into Group Annuity Contract GR–81 (hereinafter "GR–81") with Connecticut General in 1940. (Pls.' Ex. 1). Between 1940 and 1961, the Plan covered both salaried and union employees. (Pls.' Ex. 1). After 1961, only salaried employees accrued benefits under the Plan. (Pls.' Ex. 13).

7. GR–81, a standard Deposit Administration contract, was a general account insurance contract which provided for a guaranteed, fixed amount of benefits to be paid to the Plan participants upon their retirement. From 1940 to 1984, HMW and its employees made annual contributions to the Plan in the form of premiums paid to Connecticut General. (Pls.' Ex. 22).

8. Under GR–81, deposits made by HMW or its employees were not placed in a separate account, but rather were deposited into Connecticut General's unallocated proprietary general account. (Pls.' Ex. 143, Affidavit ¶ 12; Pls.' Ex. 79 at 22; Pls.' Ex. 66 at 7).

9. Connecticut General maintained accounting records that reflected contributions received under GR–81, plus interest credited, less payments and expenses incurred. The funds attributable to the Plan were accounted for and described as HMW's "Experience Rating Fund." (Pls.' Exs. 67–79).

10. For accounting and record keeping purposes, Connecticut General divided HMW's Experience Rating Fund into two subaccounts. One subaccount was known as the "Deposit Administration Account." The terms and operation of the Deposit Administration Account were set forth in detail in GR–81. The Deposit Administration Account primarily kept record of that portion of the Experience Rating Fund attributable to so-called "active-lives," that is, employees who had not yet retired, but who would draw benefits in the future.

(Pls.' Ex. 22; Pls.' Ex. 127 at 8; Pls.' Ex. 143 at ¶ 13; 6/30/92 Tr. at 105–06, 137–38, Markley Direct).

11. Another subaccount was known as the "Retired Lives Account," which kept a record of that portion of the Experience Rating Fund attributable to employees who had retired and were receiving guaranteed benefits. (Pls.' Ex. 22; Pls.' Ex. 143, Affidavit ¶ 13; Pls.' Ex. 72; Pls.' Ex. 147; 6/30/92 Tr. at 105–06, 137–38, Markley Direct). The Retired Lives Account was not explicitly referenced in GR–81.

12. Under GR–81, contributions made by HMW and its employees were always credited to the Deposit Administration Account. (Pls.' Ex. 22 at 8).

13. Under GR–81, upon retirement of a participant, Connecticut General would *"credit"* the retiree with a Retirement Annuity which guaranteed retirement benefits to the participant for the remainder of the participant's life. (Pls.' Ex. 22 at 3, 5–7, 10; 6/30/92 Tr. at 105–09, 137–38, Markley Direct). Both the cost of the Retirement Annuity and the size of the participant's monthly pension were determined in accordance with the terms and actuarial tables of GR–81. (Pls.' Ex. 22 at 5 and 10; 6/30/92 Tr. at 105–09, 137–38, Markley Direct). The cost of the Retirement Annuity was then deducted from the Deposit Administration Account and credited to the Retired Lives Account. (6/30/92 Tr. at 105–07, Markley Direct). GR–81 provided in relevant part:

As of the Annuity Commencement Date [retirement date] of a Participant or other payee, the Insurance Company [Connecticut General] *will withdraw from the Deposit Administration Fund a premium for the Retirement Annuity which is to be credited* to him in accordance with Part 4. This premium shall

be equal to the yearly amount of such Retirement Annuity as multiplied by the appropriate rate from TABLE A–3. Upon such withdrawal, the premium will be applied to purchase the Retirement Annuity (emphasis added).

(Pls.' Ex. 22 at 10).

14. In addition to crediting a retiree with a Retirement Annuity, GR–81 provided that Connecticut General issue an Individual Certificate to the retiree, as evidence that the credit had been made. (Pls.' Ex. 22 at 5 and 10; Pls.' Ex. 54; 6/30/92 Tr. at 107–08, Markley Direct). Thereafter, Connecticut General made all ensuing pension payments to the retiree, deducting the cost of each payment from the Retired Lives Account. (6/30/92 Tr. at 105–07, Markley Direct).

15. Once credited, GR–81 prohibited the cancellation of a Retirement Annuity, except under very limited circumstances not present in this case. (Pls.' Ex. 22 at 6, 12).

16. It is undisputed that the Individual Certificates constituted binding contracts which required Connecticut General to provide guaranteed benefits to retirees. (Pls.' Ex. 127 at 8–9; Pls.' Ex. 132, Answer 14; Pls.' Ex. 133, Answer 5; Deposition of David Greene ("Greene Dep.") at 153–54, 160; 6/30/92 Tr. at 106–09, 137–39, Markley Direct).[12]

17. Under GR–81, HMW was required to make contributions to the Deposit Administration Account as necessary to maintain the actuarial soundness of the Account. At any given date, GR–81 required that the funds in the Deposit Administration Account be "equal to 105% of the total amount of Participant's Contributions together with credited interest ... then living who have not elected to receive a cash refund of Contributions and *who are not*

---

**12.** In the above citations, plaintiffs' experts Markley and Greene both testified that the Retirement Annuities constituted irrevocable commitments. We held at trial that their use of the term "irrevocable commitment" was inadmissable as a legal conclusion pursuant to *Specht v. Jensen,* 853 F.2d 805, 807–10 (10th Cir.1988), *cert. denied,* 488 U.S. 1008, 109 S.Ct. 792, 102 L.Ed.2d 783 (1989); *Shahid v. City of Detroit,* 889 F.2d 1543, 1547 (6th Cir.1989); *Adalman v.*

*Baker, Watts & Co.,* 807 F.2d 359, 366 (4th Cir.1986); *Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 240 (5th Cir.1983); *United States v. Baskes,* 649 F.2d 471, 478–79 (7th Cir.1980), *cert. denied,* 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). There is nevertheless the evidence that clearly establishes that Connecticut General had a legal obligation to honor each Retirement Annuity. (Finding 74).

*receiving retirement income in the form of Retirement Annuity"* (emphasis added). (Pls.' Ex. 22 at 28). Therefore, the Deposit Administration Account contained only those funds necessary to provide benefits due the active-lives, that is, those non-retired employees who still had contributions in the Deposit Administration Account. (Pls.' Ex. at 11, 29).

18. In the event that the actuarial assumptions of GR–81 turned out to be overly conservative and there were more funds than necessary in the Retired Lives Account to satisfy the benefits of retirees, GR–81 provided for a Rate Credit to be returned from the Retired Lives Account to the Deposit Administration Account. (Pls.' Ex. 22 at 13; 6/30/92 Tr. at 106–09, 137–38, Markley Direct). On the other hand, GR–81 contained no reverse mechanism under which additional premiums could be deposited into the Retired Lives Account in the event that it became under-funded. (Pls.' Ex. 22).

19. Upon the employer's withdrawal from or discontinuance of the Plan, GR–81 provided two options for the disposition of "the amount remaining in the Deposit Administration Fund" as adjusted for interest. The relevant section of GR–81 provided in pertinent part:

EMPLOYER WITHDRAWAL AT DISCONTINUANCE. 1. As of the date of discontinuance, the *amount remaining in the Deposit Administration Fund;* after the adjustments provided for in the preceding section have been made, shall be withdrawn by the Insurance Company [Connecticut General] and shall be allocated or distributed in accordance with and subject to the further terms of this contract. The amount of such withdrawal shall be referred to hereafter as the Employer Withdrawal at Discontinuance (emphasis added).

(Pls.' Ex. 22 at 21).

20. Under, the first choice, Option A, HMW had the option of using the funds from the Deposit Administration Account to purchase a Retirement Annuity from Connecticut General. This annuity would satisfy those benefits due the active-lives, i.e. those non-retired employees who retained contributions in the Deposit Administration Account. The price and terms of the Retirement Annuity would be determined, at least in part, in accordance with the pre-determined terms and actuarial tables of GR–81. Under Option A, between 95%–100% of the funds remaining after the purchase of the Retirement Annuity would be returned to HMW. Option A provided in relevant part:

Under Option A the Employer Withdrawal at Discontinuance will be allocated and applied to purchase Retirement Annuity. The following terms shall apply to the allocation and purchase: ...

... [T]he Insurance Company [Connecticut General] will allocate the Employer Withdrawal at Discontinuance to provide Retirement Annuity in accordance with the rates in Table J. . . .

The Insurance Company [Connecticut General] will pay not less than 95% of any portion of the Employer Withdrawal at Discontinuance remaining unapplied, after completing the allocation and purchase of Retirement Annuity to the Contractholder [HMW], in accordance with the terms of Option B.

(Pls.' Ex. 22 at 22–23).

21. Under, the other choice, Option B, HMW could withdraw all of the funds in the Deposit Administration Account, provided that it released Connecticut General from any obligation to the active-lives, i.e. those non-retired employees who retained contributions in the Deposit Administration Account. Connecticut General could elect to make payment of the withdrawn funds under this option over a period not exceeding ten years. Option B provided in relevant part:

Under Option B the Insurance Company [Connecticut General] will pay not less than 95% of the Employer Withdrawal at Discontinuance less the amount of Minimum Fund Liability relating to Participants' Contributions to an insurance company or trustee designated by the Contractholder. The following terms shall apply to the amount the Insurance Com-

pany [Connecticut General] determines is payable:

(a) The Insurance Company [Connecticut General] shall have the right to make payment under this Option in monthly installments over a period not to exceed ten years.

Payment under Option B ... shall be in full discharge of all liability of the Insurance Company with respect to the Employer Withdrawal at Discontinuance.

(Pls.' Ex. 22 at 23–24).

22. Taken together, then, HMW had the option at Plan termination of purchasing a Retirement Annuity from Connecticut General with funds in the Deposit Administration Account, to satisfy the accrued benefits due the active-lives, or the option of withdrawing the funds in the Deposit Administration Account and purchasing the accrued benefits due the active-lives from another insurer. (Findings 19–22).

23. Upon termination or discontinuance of the Plan, GR–81 contained no express provision regarding the disposition of assets held in the Retired Lives Account. (Pls.' Ex. 22). However, as already noted, GR–81 prohibited the cancellation of Retirement Annuities once issued (Finding 15), and required the issuance of Individual Certificates which imposed on Connecticut General a contractual obligation to provide a fixed level of retirement benefits (Finding 16). GR–81 contained no mechanism under which additional premiums could be deposited to the Retired Lives Account in the event it became under-funded (Finding 18). For these reasons, GR–81 effectively prohibited the withdrawal of funds in the Retired Lives Account at Plan termination and the repurchase of the guaranteed benefits due retired lives from another insurer.

### D. *The Trust Fund*

24. In addition to GR–81, the HMW Plan utilized a Trust account as a funding vehicle and accumulated assets in the Trust Fund at The Chase Manhattan Bank. (Pls.' Ex. 79 at 22; Pls.' Ex. 50; Pls.' Ex. 87, last page; Pls.' Ex. 143 at ¶ 11).

25. At year ends 1983 and 1984, these Trust Fund assets amounted to more than $8 million. (Pls.' Ex. 65 at 3).

## II. TERMINATION OF THE HMW PLAN

### A. *Clabir's Termination Decision*

26. In 1983, Clabir acquired HMW. (Finding 1). In acquiring HMW, Clabir was cognizant of the over-funded status of the HMW Plan and had in mind the goal of capturing such over-funded assets for itself. (7/1/92 Tr. at 130, Strantz Cross; Pls.' Ex. 109; Pls.' Ex. 118 at 3).

27. In furtherance of its objective to capture such assets, by December, 1983, Clabir made the decision to terminate the HMW Plan and communicated the decision to HMW. (7/1/92 Tr. at 128, Strantz Cross).

### B. *Clabir Effectuates Plan Termination*

28. Clabir directed HMW to convene a meeting to begin action to effectuate its decision to terminate the HMW Plan. (7/1/92 Tr. at 128, Strantz Cross). This meeting was held in Lancaster, Pennsylvania, on January 5, 1984. (7/1/92 Tr. at 127–28, Strantz Cross; Pls.' Ex. 115). In attendance were Richard Van Hoesen, Vice President of Administration for Clabir, Timothy O'Neill, of the New York, law firm of Donovan, Leisure, Newton & Irvine, and representatives of HMW, The Wyatt Company, an actuarial firm, Coopers & Lybrand, an accounting firm, and Connecticut General. (7/1/92 Tr. at 127–28, 135, Strantz Cross; Pls.' Ex. 115).

29. Mr. Van Hoesen was a senior officer of Clabir who, along with other senior officers of Clabir, had the responsibility of overseeing Clabir's plan to terminate the HMW Plan and recapture surplus assets. (7/1/92 Tr. at 132–33, Strantz Cross). In this assignment, Mr. Van Hoesen reported to Henry D. Clarke, Jr., the President and Chief Executive Officer of Clabir. (7/1/92 Tr. at 132, Strantz Cross; Pls.' Ex. 109; Pls.' Ex. 110; Pls.' Ex. 111). Also involved at Clabir was James Schell, Vice President & Chief Financial Officer, and Bernard

Marren, an in-house attorney for Clabir. (Pls.' Ex. 109; Pls.' Ex. 111; Pls.' Ex. 112; Pls.' Ex. 115; Pls.' Ex. 117).

30. Timothy O'Neill and his law firm, Donovan, Leisure, Newton & Irvine, were retained by Clabir to be legal counsel for the plan termination and asset recapture process, to represent it before the Pension Benefit Guaranty Corporation ("PBGC") in obtaining government approvals needed and, generally, to coordinate the process. (7/1/92 Tr. at 134-35, Strantz Cross; Pls.' Ex. 115).

31. Messrs. Van Hoesen and O'Neill led the January 5, 1984 meeting at Lancaster, PA. (7/1/92 Tr. at 135, Strantz Cross). At the meeting, timetables, responsibilities and details for the HMW Plan termination were discussed and assignments were given. (7/1/92 Tr. at 128, Strantz Cross; Pls.' Ex. 115; Pls.' Ex. 117). Benefit features of the terminating plan were discussed and it was left to Clabir to decide what action to take with regard to such features. (Pls.' Ex. 117).

32. Wyatt was an actuarial firm that generally advised Clabir regarding pension matters. (7/1/92 Tr. at 130, Strantz Cross). Wyatt was retained by Clabir with respect to the HMW Plan to provide termination advice and to be the actuary for the new pension plan which would replace the terminating HMW Plan. Moreover, Wyatt was hired to review Connecticut General's actuarial work. (7/1/92 Tr. at 130, Strantz Cross; Pls.' Ex. 115).

33. Connecticut General was invited to the January, 1984 meeting. Connecticut General did not lead the meeting, but was only a participant. (7/1/92 Tr. at 135, Strantz Cross). Connecticut General was assigned the responsibility to calculate the amount of surplus plan assets and the division of such assets between employer and employees. (7/1/92 Tr. at 137, Strantz Cross; Pls.' Ex. 115).

34. A determination to terminate the HMW Plan was made by the Board of Directors of HMW on March 7, 1984, to be effective March 31, 1984. (Pls.' Ex. 66 at 5). The HMW Plan was terminated March 31, 1984. (Pls.' Ex. 105 at 1). In March,

1984, attorneys for Clabir and HMW filed an application with the Pension Benefit Guaranty Corporation ("PBGC") to terminate the HMW Plan and requested that the PBGC issue a Notice of Sufficiency with respect to the funds in the Plan. (7/1/92 Tr. at 136, Strantz Cross; Pls.' Ex. 105; Pls.' Ex. 115).

### C. Clabir's Termination Obligations

35. HMW was required by federal regulations to provide an insurance company's guarantee of the accrued benefits under the Plan in order to terminate. 29 C.F.R. § 2617.4(a) (revised as of July 1, 1984).

36. To that end, Clabir, with the assistance of the Wyatt Company, an international actuarial consulting firm, considered various options for providing accrued benefits to Plan participants at termination. One option was to provide benefits through a supplemental plan. (Pls.' Ex. 111; Pls.' Ex. 119). Another option was to use a portion of the Plan's assets to purchase a single premium, annuity or guaranteed cost contract, under which an insurance company would agree to guarantee the Plan's accrued benefits. (7/1/92 Tr. at 131-32, Strantz Cross; Pls.' Ex. 118-119).

37. In evaluating this second option, Clabir requested that Connecticut General provide it with a quote as to the premium which it would charge to provide guaranteed annuity benefits with respect to all accrued benefits under the Plan with respect to both active and retired lives. (7/1/92 Tr. at 131-32, Strantz Direct; Pls.' Ex. 118; Pls.' Ex. 119).

38. On Wyatt's advice, Clabir also considered seeking competitive bids for a guaranteed cost contract from other insurance companies. (Pls.' Ex. 119). This option was limited by the contractual terms of GR-81. (Findings 6-23).

39. Employers who wish to terminate a pension plan need not obtain quotes from more than one insurance company before selecting an insurance company to guarantee accrued benefits through the provision of an annuity contract. (29 C.F.R. § 2617.-14(b)(2) (revised as of July 1, 1984);

6/30/92 Tr. at 163, Markley Cross; Greene Dep. at 184–88).

### D. Negotiations With Connecticut General

40. Between January, 1984 and May, 1985, Connecticut General prepared quotes as to the premium it would charge Clabir and HMW for a single premium, guaranteed cost annuity contract ("guaranteed cost contract") to guarantee the accrued benefits of the Plan participants as of the Plan termination. (Pls.' Ex. 25; Pls.' Ex. 105; Pls.' Ex. 111; Pls.' Ex. 112; Pls.' Ex. 118). These quotes, and pricing assumptions underlying the quotes, were submitted periodically to Clabir and Wyatt. (Pls.' Ex. 111; Pls.' Ex. 112; Pls.' Ex. 118).

41. Clabir carefully reviewed and studied the Connecticut General quotes, and enlisted the assistance of Wyatt to examine the details of the Connecticut General proposals. (Pls.' Ex. 112).

42. Clabir understandably wanted to achieve the lowest possible cost for the guaranteed cost contract. (Pls.' Ex. 111; Pls.' Ex. 118; Pls.' Ex. 136).

43. Clabir negotiated with Connecticut General to obtain the guaranteed cost contract. (Pls.' Ex. 111; Pls.' Ex. 118; Pls.' Ex. 136; 7/1/92 Tr. at 132, Strantz Cross). Such negotiations included meetings in February, 1984 as well as in the Fall of 1984. (Pls.' Ex. 118; Pls.' Ex. 136). These meetings were initiated by Clabir. (Id.) Clabir relied upon the advice and assistance of Wyatt both prior to and at these meetings. (Pls.' Ex. 112; Pls.' Ex. 118; Pls.' Ex. 119; Pls.' Ex. 136). Over the course of time, Connecticut General reduced its quotes from $18.8 million (Pls.' Ex. 118) to $17.3 million (Pls.' Ex. 112) to $16.9 million (Pls.' Ex. 66 at 5).

### E. Clabir Chooses To Purchase A Guaranteed Cost Contract From Connecticut General

44. GR–81 prohibited the cancellation of a Retirement Annuity once purchased and prohibited the repurchase of such an annuity from another insurer. (Finding 23). Therefore, the only funds which Clabir could withdraw and apply toward the purchase of a competitively bid guaranteed cost contract, were those funds in the Deposit Administration Account and those funds in the Trust Funds. (Findings 22, 24–25; Pls.' Ex. 22; Greene Dep. at 75–76; 6/30/92 Tr. at 153–54, Markley Cross).

45. At the time of termination, the present value of the Retired Lives Account was approximately $11.5 million; the present value of the Deposit Administration Account was approximately $5.4 million.[13] (Pls.' Ex. 87; Pls.' Ex. 112; Pls.' Ex. 127 at 5–6; 6/30/92 Tr. at 128, Markley Direct); and the Trust Fund assets exceeded $8 million. (Pls.' Ex. 22; Pls.' Ex. 65 at 3).

46. Plaintiffs concede, at this point, that Connecticut General gave Clabir the option of withdrawing the $5.4 million held in the Deposit Administration Account over a ten year period. (Pls.' Ex. B).[14]

47. There is no evidence that plaintiffs were prohibited from withdrawing the $8 million held in the Trust Funds.

48. Plaintiffs assert that if Clabir had decided to withdraw the $5.4 million held in the Deposit Administration Account and repurchase those benefits from another insurer, such an option would have been rejected by the IRS. There is no evidence that such a option was ever pursued or formally presented to the IRS. (6/30/92 Tr. at 152–54, Markley Cross).

---

**13.** With the exception of line item 6(a) on Attachment A to the 1983 IRS 5500 Form (Pls.' Ex. 87), which shows more than $18 million, there is no evidence to suggest that the funds in the Deposit Administration Account at Plan termination totaled more than $5.4 million. Even if we were to assume that line item 6(a) includes only those assets of the Deposit Administration Account (as plaintiffs have failed to provide such proof except by way of Pls.' Ex. C, not in evidence, see supra n. 9), we can only find, that in light of the overwhelming evidence to the contrary, the $18 million figure on line 6(a) is incorrect. Moreover, there is no evidence that Connecticut General was in any way responsible for this incorrect figure. (7/1/92 Tr. at 56, 117–119, Strantz Direct and Cross).

**14.** See supra n. 9.

49. There is no evidence of any kind that the IRS would have rejected a proposal to purchase the benefits due the active-lives with both the $5.4 million held in the Deposit Administration Account and the $8 million in the Trust Funds, nor was such a proposal ever pursued or formally presented to them.

50. In the Fall, 1984, in negotiation sessions between Clabir, Wyatt and Connecticut General, Clabir attempted to obtain concessions from GR–81 to enable it to seek competitive bids on the guaranteed cost contract to be purchased. Connecticut General responded by standing firm on the provisions of the contract which prohibited the cancellation of retirement annuities previously purchased and their repurchase from another insurance company. (Pls.' Ex. 112; Pls.' Ex. 136; 7/1/92 Tr. at 8, Markley Cross; Greene Dep. at 57, 79–80).

51. Clabir and HMW, with the advice of Wyatt, chose, albeit begrudgingly, to purchase a guaranteed cost contract from Connecticut General for $16.9 million. (Pls.' Ex. 25; Pls.' Ex. 136).

52. The final premium price of $16.9 million was the product of arms-length negotiations between HMW and Connecticut General. In fact, Connecticut General's guaranteed cost offer was decreased over time as a result of such negotiations. (Findings 40–43). Plaintiffs have failed to prove that Connecticut General exacted an excessively high premium for its guaranteed cost contract. (6/30/92 Tr. at 156–163, Markley Cross).

F. *Other Plan Documents*

53. From 1940 until 1976, GR–81 was the single, specific written document containing all of the Plan's terms. (7/1/92 Tr. at 62, Strantz Direct; Pls.' Exs. 1–21).

54. Plan participants received, however, a yearly summary of the Plan in the form of a "Plan Booklet" entitled "COOPERATIVE RETIREMENT ANNUITY PLAN." (7/1/92 Tr. at 60–62, Strantz Direct; Pls.' Exs. 26–34). The Plan Booklets contained the following disclosure, or similar language:

The foregoing is intended to be only a summary of the Plan and not a complete description thereof. For an exact statement of the rights of the Participants, reference is made to the Insurance Company's Group Annuity Contract [GR–81] with the Company, which is available for examination by any Participant in the Plan.

(Pls.' Ex. 26 at 14; Pls.' Ex. 27 at 13; Pls.' Ex. 28 at 15; Pls.' Ex. 29 at 15; Pls.' Ex. 30 at 15; Pls.' Ex. 31 at 13; Pls.' Ex. 32 at 11; Pls.' Ex. 33 at 15; Pls.' Ex. 34 at 16).

55. The Plan Booklets for 1964, 1965, 1966, and 1972 contained the following language:

In the event the Plan is discontinued, Company contributions made on or after January 1, 1964 will be allocated among the active participants and *no contributions will revert to the Company except to the extent that aggregate Company contributions are in excess of the Company's liability under the Plan* (emphasis added).

(Pls.' Ex. 30 at 12; Pls.' Ex. 31 at 10; Pls.' Ex. 32 at 10; Pls.' Ex. 33 at 11).

56. The Plan Booklets were prepared by Connecticut General and distributed by HMW. (7/1/92 Tr. at 60–62, Strantz Direct; Pls.' Exs. 26–34).

57. In 1976, the Plan was restated to comply with ERISA. At that time, GR–81 was amended, and for the first time, the terms of the Plan were reduced for Plan participants into a single, Plan Document entitled "HMW Industries, Inc. Cooperative Retirement Income Plan." (Pls.' Ex. 37). Plan participants continued to receive a summary of the Plan's terms by way of the Plan Booklets. (7/1/92 Tr. at 62–63, Strantz Direct).

58. Section 16.11 of the Plan Document provided as follows:

After the assets of the Fund have been withdrawn and allocated in accordance with the preceding terms of this section [the section dealing with Plan termination], *any amount remaining in the*

*Fund will be returned to the Employer* (emphasis added).

(Pls.' Ex. 37 at 39).

59. The Plan Document was prepared by Connecticut General. (7/1/92 Tr. at 62–63, Strantz Direct).

60. In addition to receiving copies of the Plan Document and the Plan Booklets, ERISA required that Plan Participants receive a Summary Annual Report after 1976. The Summary Annual Report was designed to give participants some idea of the Plan's activity during the prior year. (7/1/92 Tr. at 66–68, Strantz Direct).

61. The Summary Annual Reports for the years 1976–78 contained the following language: *"in no event will any funds revert to the Company"* (emphasis added). (7/1/92 Tr. at 67, Strantz Direct; Pls.' Ex. 41 at 2; Pls.' Ex. 42 at 2; Pls.' Ex. 43 at 2).

62. The Summary Annual Reports for the years 1976–78 were mostly prepared by Gloria Strantz and the accounting firm of Coopers & Lybrand. Connecticut General provided the necessary actuarial figures. (7/1/92 Tr. at 66–68, 101–03 Strantz Direct and Cross; Pls.' Ex. 125).

63. There is no evidence who, if anyone, reviewed the Plan documents to determine whether or not the documents permitted a reversion of surplus assets to HMW and Clabir. There is no evidence that Connecticut General ever considered [15] or was asked to consider whether or not the Plan documents would permit a portion of the Plan's surplus assets to revert to the HMW or Clabir. Rather, the evidence clearly demonstrates that Clabir and outside consultants all proceeded on the assumption that

at least a portion of the Plan's surplus would revert. The only question was how much. (7/1/92 Tr. at 103–110, Strantz Cross; Pls.' Ex. 109; Pls.' Ex. 115; Pls.' Ex. 117; Pls.' Ex. 118).

64. There is no evidence that Connecticut General was aware of the allegedly contradictory language [16] of the Summary Annual Reports until 1987, long after the Plan's termination. Nor is there any evidence that Connecticut General concealed the reversion language contained in the Summary Annual Reports from Clabir or HMW. (7/1/92 Tr. at 66–68, Strantz Direct; Pls.' 125).

65. Ordinarily, actuaries are not asked to and do not of their own accord, review plan documents and make legal determinations thereon. (6/30/92 Tr. at 118, Markley Direct).

### G. *Connecticut General's Calculations and Recommendations*

66. Between January, 1984 and May, 1985, Connecticut General performed actuarial calculations with respect to the allocation of residual Plan assets between employer and employees. (Pls.' Ex. 143 at ¶¶ 23–32; 7/1/92 Tr. at 137–38, Strantz Cross).

67. Connecticut General made its calculations on the basis of the PBGC's preapproved formula set forth at 29 C.F.R. § 2618.31(b). (Pls.' Ex. 143 at ¶ 24). Connecticut General recommended to HMW and Clabir that this formula be used. HMW and Clabir approved this recommendation.[17] (Pls.' Ex. 143 at ¶ 25).

---

**15.** We find John Markley's testimony to the contrary to be unconvincing. John Markley testified that he found no documents which would indicate that the reversion issue was ever discussed or considered by anyone involved in the Plan termination; therefore, he assumed that Connecticut General must have been responsible for the decision. Finding no basis for this speculation, we reject this testimony. (6/30/92 Tr. at 117–119, Markley Direct).

**16.** While there is testimony suggesting that the language in the Summary Annual Reports was ambiguous and possibly reconcilable with the reversion language of the Plan Document

(7/1/92 Tr. at 103–110, Strantz Cross), we need not make such a finding at this time.

**17.** At trial Gloria Strantz testified that there were three pre-approved PBGC formulae and that

Connecticut General selected the formula that was to be used in the split. As plan administrator I thought that all three—that the calculation should be made under all three formulas to see which would give the employees the best shot at over-funding. Connecticut General told me this was not possible. (7/1/92 Tr. at 75, Strantz Direct).

Contrary to Strantz's testimony, however, the applicable regulations make clear that the for-

68. At termination, the Plan had assets of approximately $26.5 million. After subtracting a purchase price of $16.9 million for the guaranteed cost contract, the Plan had surplus assets of approximately $9.6 million.

69. The method Connecticut General used to determine the percentage of surplus distributed to Plan participants was to multiply the $9.6 million surplus by a fraction which consisted of a numerator composed of (a), the total contributions by Plan participants, and the denominator composed of that number (a) and (b), the cost of benefits to be purchased upon termination, and (c) the cost of retirees benefits:

$$\frac{(a)\ \$2,954,025}{(a)\ \$2,954,025\ +\ (b)\ \$2,815,314\ +\ (c)\ 11,635,007} = 17\%$$

Under Connecticut General's calculations, seventeen percent (17%) of the surplus assets, or $1,705,492 would be distributed to Plan participants and eighty-three percent (83%) or $7,926,756 would be distributed to HMW and Clabir.

70. The PBGC regulations concerning the division of surplus assets between employer and employee specify that an irrevocable commitment "is not considered a plan asset," and that "a benefit payable under such a commitment is excluded from the allocation process." C.F.R. § 2618.3.

71. Plaintiffs allege in Count II of their Complaint that since GR–81 provided for the purchase of Retirement Annuities upon a participant's retirement and since GR–81 provided that the liability for the Retirement Annuity would be borne by Connecticut General, the value of (c), i.e., the cost of retirees benefits, represented an irrevocable commitment. Therefore, plaintiffs argue that Connecticut General should not have included the cost of retirees benefits in its calculations, and that the proper formula was as follows:

$$\frac{(a)\ \$2,954,025}{(a)\ \$2,954,025\ +\ (b)\ \$2,815,314} = 54.6\%$$

Under plaintiffs proposed formula, $5,254,391 would be distributed to plaintiffs. (Complaint; 6/30/92 Tr. at 126–143, Markley Direct).

72. Plaintiffs allege that Connecticut General improperly and intentionally included the retirees benefits in order to exact an excessively high premium for the guaranteed cost contract, i.e. by intentionally manipulating its calculations in favor of Clabir and HMW, plaintiffs argue that Connecticut General hoped, and such hope was realized, that neither Clabir nor HMW would question Connecticut General's allegedly excessive premium. (Complaint).

73. Connecticut General maintained that the retiree benefits were Plan assets, and as such, were not irrevocable commitments, because money could be moved from the Retired Lives Account to the Deposit Administration Account (Finding 18). Under the terms of GR–81, the Plan operated on an experienced rated basis, and, from 1961 to 1983, the aggregate of Rate Credits transferred to the Deposit Administration Account were over $10 million. This was a considerable sum of money. Since these

mula selected by Connecticut General and approved by Clabir must be used unless an alternative method is expressly approved by the PBGC. *See* 29 C.F.R. § 2618.31(b). Moreover, the record indicates that Gloria Strantz lacked both the authority and acumen to evaluate or approve Connecticut General's recommendation with respect to the PBGC formula. (7/1/92 Tr. at 74, 131–32, Strantz Direct and Cross).

Rate Credits could not have occurred but for the fact that the retirees benefits were Plan assets, Connecticut General took the position that the retirees benefits were properly considered as Plan assets, and as such, were properly included in its calculations. (Pls.' Ex. 107; Pls.' Ex. 121, Pls.' Ex. 143).

74. Nevertheless, if this case were to proceed further, plaintiffs would probably be able to prove that the retirees benefits were irrevocable commitments, and as such that Connecticut General was at least negligent in its inclusion of these benefits in its calculations. The Third Circuit reached such a result previously in this case. *Fechter v. HMW Industries, Inc.*, 879 F.2d 1111, 1117–19 (3d Cir.1989). We need not further decide this issue at this point beyond noting that, at the time they did it, Connecticut General had a reasonable—albeit seemingly incorrect—basis for doing what it did.

75. Contrary to plaintiffs' allegations, there is no evidence that Connecticut General intentionally manipulated its calculations. Rather, plaintiffs ask us to infer such wrong-doing merely because, in plaintiffs' mind, Connecticut General could have had no acceptable reason to use the actuarial assumptions it adopted but for its own financial security. We find no evidence, however, that Connecticut General's calculations are not so blatantly unreasonable to support such a conclusion. Given Clabir's and Wyatt's exhaustive review of Connecticut General's calculations (Findings 76–80) and the plain language of GR–81 coupled with Connecticut General's reasonable explanation for its calculations (Finding 73), we do not find Connecticut General's calculations to be unreasonable.

### H. *Review and Approval of Connecticut General's Calculations*

76. One of the responsibilities of Wyatt was to oversee and review the allocation calculations being made by Connecticut General. (7/1/92 Tr. at 130). Clabir was using Wyatt "to check on Connecticut General" and to "look over the shoulders of Connecticut General." (7/1/92 Tr. at 130).

Wyatt fulfilled these responsibilities. (Pls.' Ex. 119; Pls.' Ex. 121; Pls.' Ex. 122).

77. Clabir made an independent review of the correctness of the Connecticut General allocation calculations. (7/1/92 Tr. at 130–31, Strantz Cross).

78. The allocation calculations of Connecticut General were questioned by employees, and employees filed complaints with the PBGC. (Pls.' Ex. 106). The PBGC inquired into the calculation of the allocation of surplus assets. (Pls.' Ex. 121). Shereff, Friedman, Hoffman & Goodman, a second law firm representing Clabir, and Wyatt responded to the PBGC inquiries and both reviewed and reaffirmed the correctness of the calculations. (Pls.' Ex. 107; Pls.' Ex. 121). There is no evidence that the PBGC ever evaluated the correctness of the calculations. (Pls.' Ex. 109).

79. Clabir and HMW made the final determination of the allocation of surplus plan assets between employer and employees. (7/1/92 Tr. at 141, Strantz Cross).

### I. *Clabir's Termination Role*

80. At all times during the process of terminating the HMW Plan and allocating and distributing surplus Plan assets, Clabir was making the decisions, was the "moving force" and was "calling the shots." (7/1/92 Tr. at 130, 139; Pls.' Ex. 109; Pls.' Ex. 110; Pls.' Ex. 111; Pls.' Ex. 112; Pls.' Ex. 117).

81. The role and involvement of Connecticut General in the process of terminating the HMW Plan was limited to: (a) the sale to Clabir and HMW of a guaranteed cost contract, and (b) providing calculations to Clabir and HMW of the amount and division of surplus Plan assets. (7/1/92 Tr. at 138–39).

### J. *Distribution of Plan Assets*

82. On and before December 5, 1985, HMW distributed seventeen percent (17%) of the surplus HMW Plan assets to plan participants ($1,705,492) and eighty-three percent (83%) to itself ($7,926,756). (Pls.' Ex. 66 at 5).

83. Connecticut General retained only the $16.9 million premium for the guaranteed cost contract. (*Id.*)

## DISCUSSION

Newly amended Fed.R.Civ.P. 52(c) provides, in pertinent part, that

[i]f during a trial without a jury a party has been fully heard with respect to an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained ... without a favorable finding on that issue. ...

Fed.R.Civ.P. 52(c). Judgment on partial findings under Rule 52(c) has been designated as the procedural successor to involuntary dismissal under Rule 41(b). Fed.R.Civ.P. 41(b) advisory committee's notes; Fed.R.Civ.P. 52(c) advisory committee's notes. Therefore, when considering Connecticut General's motion for judgment on partial findings, this Court will look to the legal standard previously articulated for involuntary dismissal under Rule 41(b).

Rule 52(c) enables a court, acting as trier of fact, to dispose of an action when it is clear that plaintiffs have failed to prove their case. *Pan Am. World Airways, Inc. v. Continental Bank*, 435 F.Supp. 642, 642 n. 1 (E.D.Pa.1977).

In passing on a motion [for judgment on partial findings], '[t]he court is not to make any special inferences in the plaintiff's favor nor concern itself with whether plaintiff has made out a prima facie case. Instead it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.'

*Beissinger v. Rockwood Computer Corp.*, 529 F.Supp. 770, 775 n. 4 (E.D.Pa.1981) (quoting *Sworob v. Harris*, 451 F.Supp. 96, 99 (E.D.Pa.), *aff'd*, 578 F.2d 1376 (3d Cir. 1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979)); 9 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 2371, pp. 224–25 (1971). A plaintiff must satisfy its burden of proof by a preponderance of the evidence. *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 1807, 60 L.Ed.2d 323 (1979). Unlike a motion for directed verdict, the court need not determine that the defendant is entitled to judgment as a matter of law.[18] *See Martin v. E.I. duPont de Nemours & Co., Inc.*, 281 F.2d 801, 802 (3d Cir.1960); *Lyncott Corp. v. Chemical Waste Management, Inc.*, 690 F.Supp. 1409 (E.D.Pa.1988). With these standards in mind, we turn now to the issue of whether or not plaintiffs' have met their burden of proving by a preponderance of the evidence that defendant Connecticut General was an ERISA fiduciary, and as such, was liable to plaintiffs for its work in connection with the Plan's termination.

### A. Definition Of A Fiduciary.

Plaintiffs' suit is based upon the dual claims that Connecticut General committed a breach of fiduciary duty under ERISA, (1) when, as the Plan's insurance company, it charged an excessive premium for the single premium, guaranteed cost contract which it sold to the Plan at termination, and (2) when, as the Plan's actuary, it wrongfully calculated the allocation of the Plan's surplus assets at termination to the detriment of Plan participants.

Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), provides that a "person" is a fiduciary only "to the extent"

(i) he exercises any discretionary authority or discretionary control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect,

---

**18.** While the two cases in this circuit which hold that motions filed pursuant to Rule 41(b) are to be governed by a directed verdict standard have never been explicitly overruled, *see e.g. Schad v. Twentieth Century-Fox Film Corp.*, 136 F.2d 991 (3d Cir.1943) and *Federal Deposit Insurance Corp. v. Mason*, 115 F.2d 548 (3d Cir.1940), it is clear from the later case law, that the Third Circuit has, in fact, adopted a preponderance of the evidence standard for motions filed under Rule 41(b), and now by extension, for motions filed under Rule 52(c). *Martin v. E.I. DuPont de Nemours & Co., Inc.*, 281 F.2d 801, 802 (3d Cir.1960); *Sworob v. Harris*, 451 F.Supp. 96, 99 (E.D.Pa.), *aff'd*, 578 F.2d 1376 (3d Cir.1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979).

with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

■ It is well established that not all parties who render services or who offer and sell products to a retirement plan are "fiduciaries" within the meaning of ERISA's definition. Rather, a party becomes a fiduciary only if and to the extent that it exercises or has the power to exercise "actual decision-making power" on behalf of a plan with respect to the management or administration of the plan or the investment or disposition of its assets. *Pappas v. Buck Consultants, Inc.,* 923 F.2d 531, 535 (7th Cir.1991); *Associates In Adolescent Psychiatry v. Home Life,* 941 F.2d 561, 568–570 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse,* 879 F.2d 1146, 1150 (3d Cir.1989); *Mertens v. Hewitt Associates,* 948 F.2d 607, 610 (9th Cir.1991), *cert. filed,* 60 U.S.L.W. 37, 46. Accordingly, the courts have refused to impose fiduciary obligations on insurance companies who merely sell their products or services to a pension plan unless, under the terms of such contracts, the insurer assumes decision-making control over the administration of the plan or the disposition of its assets. *See e.g. American Fed'n of Unions v. Equitable Life Assur. Soc'y,* 841 F.2d 658, 664 (5th Cir.1988); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.,* 805 F.2d 732, 737 (7th Cir.1986), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (citing *Schulist v. Blue Cross,* 717 F.2d 1127 (7th Cir.1983)); *Trustees of Laborers' Local 72 v. Nationwide Life,* 783 F.Supp. 899, 908–911 (D.N.J.1992). Similarly, the courts have repeatedly held that " 'attorneys, accountants, actuaries, ... consultants [and similar professionals] performing their usual professional functions will ordinarily not be considered fiduciaries" unless they go beyond their normal roles and assume management or administrative

responsibilities. *Painters,* 879 F.2d at 1150–51 (quoting Interpretive Bulletin 75–5, 29 C.F.R. § 2509.75–5 (1988)); *see also Pappas,* 923 F.2d at 535–38; *Mertens,* 948 F.2d at 610; *Nieto v. Ecker,* 845 F.2d 868, 870 (9th Cir.1988).

■ Even if someone is a fiduciary under a retirement plan this does not necessarily mean he or she is a fiduciary with respect to all fiduciary obligations under the plan. Rather, as reflected by the statutory language of the definition, a person is a fiduciary only "to the extent" he or she exercises control over those specific breaches of fiduciary duty on which plaintiffs base their claims. 29 U.S.C. § 1002(21)(A); *Associates In Adolescent Psychiatry v. Home Life,* 941 F.2d 561, 569 (7th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992) (citing *Leigh v. Engle,* 727 F.2d 113, 133 (7th Cir.1984)); *Landry v. Air Line Pilots Ass'n Intern. AFL–CIO,* 901 F.2d 404, 418 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990) (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1459–60 (5th Cir.), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987)). Taken together then, we must determine, as a factual matter, the extent to which Connecticut General possessed or exercised decision-making control or authority with respect to the wrongs alleged by plaintiffs. With these standards in mind, we address plaintiffs' claims.

**B. Guaranteed Cost Contract Claim.**

Before a pension plan can be terminated, all of the liabilities for plan participants must be satisfied. *See* 29 U.S.C. § 1344(d)(1)(A). To that end, the record demonstrates that Clabir, with the assistance of the Wyatt Company, an international actuarial consulting firm, considered various options for providing accrued benefits to Plan participants at termination. One such option was to provide benefits through a supplemental plan. Another option was to use a portion of the Plan's assets to purchase a single premium, annui-

ty or guaranteed cost contract, under which an insurance company would agree to guarantee the Plan's accrued benefits. (Findings 35–36).

In evaluating this second option, Clabir requested that Connecticut General provide it with a quote as to the premium it would charge to provide a guaranteed cost contract with respect to all accrued benefits under the Plan, i.e. both active and retired lives. On Wyatt's advice, Clabir also considered seeking competitive bids for a guaranteed cost contract from other insurance companies. However, this option was limited by the contractual terms of GR–81, the deposit administration, group annuity contract which Connecticut General had issued to HMW in 1940. (Findings 37–39).

Connecticut General took the position that, under the terms of GR–81, the only funds which HMW and Clabir could withdraw and use to purchase a competitively bid guaranteed cost contract were those in the Deposit Administration Account. Connecticut General felt that the funds in the Retired Lives Account could not be withdrawn as they were supporting the guaranteed benefits being paid by Connecticut General to retirees under the terms of Retirement Annuities which Connecticut General had sold to the Plan as participants retired. Moreover, Connecticut General maintained that it had the option under GR–81 to pay-out the funds in the Deposit Administration Account over a ten year period, thereby further restricting HMW's ability to competitively bid the guaranteed cost contract with respect to the active-lives. Believing that any payment over time of the Deposit Administration Account

would be insufficient to purchase annuities for all active-lives participants, Clabir and HMW, with the advice of Wyatt, grudgingly accepted Connecticut General's interpretation of the contract and decided to purchase the guaranteed cost contract from Connecticut General for $16.9 million, without the benefit of competitive bids. (Findings 50–51).

Plaintiffs claim that Connecticut General exercised discretionary authority or control over the Plan's purchase of the guaranteed cost contract and thereby became an ERISA fiduciary, under the terms of GR–81. They allege that Connecticut General "prohibit[ed] the Plan from seeking competitive bids and then charg[ed] the Plan a 'captive' premium" for the guaranteed cost contract it sold to the plan. Preliminary Trial Memorandum Relating To The Fiduciary Status Of Connecticut General Life Insurance Company, docket entry no. 203, at 4. We begin by reviewing the terms of GR–81.

### 1. GR–81

GR–81 operated like most standard Deposit Administration contracts. From 1940 to 1984, HMW and its employees made annual contributions in the form of premiums paid to Connecticut General. Those contributions were deposited into Connecticut General's unallocated, general account and credited to the Deposit Administration Account. In exchange, Connecticut General promised to provide a fixed level of benefits to Plan participants upon their retirement.[19] (Findings 6–23).

---

**19.** Plaintiffs argue that Connecticut General was a fiduciary with respect to those Plan assets which Connecticut General held and managed for the Plan in its general, unallocated account. We disagree. The Third Circuit has clearly rejected this argument holding that ERISA's fiduciary provisions do not apply to those plan assets held by an insurance company pursuant to the terms of a standard, deposit administration contract, provided that the plan's assets are deposited into the insurer's general proprietary account and provided that the insurer is contractually bound to provide a fixed level of benefits to plan participants upon retirement. *Mack Boring and Parts v. Meeker Sharkey Mof-*

*fitt,* 930 F.2d 267, 272–273 (3d Cir.1991). GR–81 clearly satisfies both of these requirements. (Findings 6–23).

Apparently aware of the *Mack Boring* precedent, plaintiffs also argue that Connecticut General assumed fiduciary control over the Plan's assets when it retained possession of the assets and refused, under the terms of GR–81, to payout the funds in the Retired Lives Account to HMW at Plan termination. Although made in connection with plaintiffs' argument that Connecticut General managed the Plan's assets, this issue depends on Connecticut General's rights under the terms of GR–81 and is discussed below at pp. 199–202.

Although GR–81 contained no express provision regarding the disposition of funds held in the Retired Lives Account at Plan termination, the contract effectively prohibited the withdrawal of those funds and the repurchase of retirement benefits from another insurer. (Finding 23). However unartfully drawn, it is clear from the contractual language of GR–81 that the Retirement Annuities which were provided to participants upon their retirement were not in fact annuities. Rather, the Retirement Annuity served only as a bookkeeping device. Upon the retirement of a Plan participant, GR–81 provided that Connecticut General "credit" the participant with a Retirement Annuity. (Finding 13). Once credited, GR–81 prohibited the cancellation of a Retirement Annuity, except under very limited circumstances not present in this case. (Finding 15). In addition to crediting the retiree with a Retirement Annuity, GR–81 provided that Connecticut General issue a Certificate to the retiree as evidence that the credit had been made. (Finding 14). It is undisputed that the Certificate constituted a binding contract on Connecticut General to provide the guaranteed benefits. (Finding 16). Moreover, GR–81 contained no mechanism under which additional premiums could be deposited into the Retired Lives Account in the event it became under-funded. (Finding 18). Taken together then, the funds in the Retired Lives Account remained Plan assets on paper only, and there can be no question that the funds, minus any necessary Rate Credits, belonged to Connecticut General. (Finding 23).

Our interpretation of GR–81 is further strengthened by the fact that GR–81 operated on an experienced rating basis. In the event that the actuarial assumptions of GR–81 turned out to be overly conservative and there were more funds than necessary in the Retired Lives Account to satisfy the benefits of retirees, GR–81 provided for a Rate Credit to be returned from the Retired Lives Account to the Deposit Administration Account. (Finding 18). But for these Rate Credits, there would be no reason to maintain the Retired Lives Account. Rather, as an individual retired, an actual annuity would have been purchased, and in that situation, the retirement funds would have passed immediately to Connecticut General. Accordingly, GR–81 prohibited cancellation of the Retirement Annuities and their repurchase from another insurer, and we find that, in declining to permit HMW to repurchase from another insurer the benefits previously guaranteed by Connecticut General to retirees, Connecticut General was properly adhering to the terms of its contract with HMW.

On the other hand, under the terms of GR–81, HMW had two options for dealing with the Deposit Administration Account. The first option was that of purchasing a Retirement Annuity, at Plan termination, with the funds in the Deposit Administration Account to satisfy those benefits due the active-lives. (Findings 19–20). Alternatively, HMW had the option of withdrawing all funds from the Deposit Administration Account and releasing Connecticut General from any obligation to active-lives participants. (Finding 21). Under the second option, Connecticut General had the right to pay-out the funds in the Deposit Administration Account over a ten year period. (Finding 21). Therefore, HMW and Clabir had the option, at least on paper,[20] to competitively bid the active-lives portion of the guaranteed cost contract at Plan termination.

### 2. Connecticut General's Reliance On GR–81.

The Courts have consistently and repeatedly held that if a specific contractual term is bargained for at arm's length, adherence to that term, at a pre-determined price, is not a breach of fiduciary duty. *See e.g. American Fed'n of Unions v. Equitable Life Assur. Soc'y*, 841 F.2d 658, 664 (5th Cir.1988); *Ed Miniat, Inc. v. Globe Life Ins. Group, Inc.*, 805 F.2d 732, 737 (7th Cir.1986), *cert. denied*, 482 U.S.

---

**20.** As discussed below at pp. 200–201, plaintiffs argue that any payment over time of the insignificant active-lives account would neither pass IRS muster nor be sufficient to purchase annuities for all participants.

915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) (citing *Schulist v. Blue Cross*, 717 F.2d 1127 (7th Cir.1983)); *Trustees of Laborers' Local 72 v. Nationwide Life*, 783 F.Supp. 899, 908–911 (D.N.J.1992). When, however, a contract grants an insurer discretionary authority to later change the terms of a contract, the insurer may be a fiduciary, even though the contract is itself the product of an arm's length bargain. *Ed Miniat*, 805 F.2d at 737 (citing *Chicago Board Options Exchange v. Connecticut General Life Insurance Co.*, 713 F.2d 254 (7th Cir. 1983). In so holding, the courts have reasoned that an insurance policy itself is a plan asset and therefore, the ability to amend it and thereby affect its value, grants discretionary control over that asset to the insurer. *Id.*

■ Under these well established principles, we find no basis for holding that Connecticut General exercised discretionary control over the Plan or its assets when it purchased Retirement Annuities from itself at pre-determined prices and with funds from the Retired Lives Account. *Nationwide Life*, 783 F.Supp. at 908–911; *Associates In Adolescent Psychiatry v. Home Life*, 729 F.Supp. 1162, 1188–89 (N.D.Ill.1989), *aff'd*, 941 F.2d 561 (7th Cir. 1991), *cert. denied*, — U.S. —, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992). These transactions were precisely what HMW had bargained for and what the parties agreed to under the terms of GR–81. Accordingly, Connecticut General assumed no fiduciary duties when it refused to permit Clabir or HMW to withdraw the funds in the Retired Lives account or to competitively bid those benefits which Connecticut General had previously guaranteed.

In response, plaintiffs argue that GR–81 vested discretionary control in Connecticut General over the Plan's assets by giving Connecticut General the contractual right to disburse 95%–100% of the funds of the Deposit Administration Account over a period of ten years. In support of their position, plaintiffs rely on *Chicago Board Options Exchange v. Connecticut General Life Insurance Company*, 713 F.2d 254 (7th Cir.1983), a case in which the insurer

*unilaterally amended* the plan to include a similar provision, to the case at bar, under which contributions to the plan could not be withdrawn for ten years. The Seventh Circuit held as follows:

> Nevertheless, the policy itself is a Plan asset, and [the insurer's] ability to amend it, and thereby alter its value, is not qualitatively different from the ability to choose investments. By locking [plaintiffs] into the Guaranteed Accounts for the next 10 years [the insurer] has effectively determined what type of investment the Plan must make. In exercising this control over an asset of the Plan, [the insurer] must act in accordance with its fiduciary obligations.

*Chicago Board*, 713 F.2d at 260.

We find plaintiffs' argument unpersuasive. In *Chicago Board*, the insurer made a unilateral change to a plan thereby imposing an investment decision on the plan and its participants. By contrast, in the case at bar, Connecticut General's right to disburse the funds in the Deposit Administration Account over a ten year period, was in effect part of the pre-determined price HMW agreed to pay for Connecticut General's services. In exchange for assuming certain risks associated with underwriting a pension plan, Connecticut General bargained for and was granted the right to retain up to 5% of the funds in the Deposit Administration Account and to disburse the remaining 95% of the funds over a ten year period. While we agree that this ten year option amounts to an investment decision on behalf of the Plan, this decision was not made by Connecticut General; rather it was made by HMW pursuant to an arms-length transaction and the conditions of the marketplace in 1940. Therefore, we find that Connecticut General assumed no fiduciary obligations when it refused, under the terms of GR–81, to pay out in a lump sum the funds in the Deposit Administration Account. *Ed Miniat*, 805 F.2d at 737; *Nationwide Life*, 783 F.Supp. at 908–911.

If Connecticut General were to become a fiduciary merely by enforcing the terms of GR–81, then contrary to the plain language

of 29 U.S.C. § 1101(b)[21] and contrary to the Third Circuit's holding in *Mack Boring and Parts v. Meeker Sharkey Moffitt,* 930 F.2d 267, 270–276 (3d Cir.1991), the assets of any issuer of a standard, deposit administration annuity contract would become plan assets, burdened with ERISA's fiduciary obligations. We cannot endorse such a result here. Accordingly, we find that Connecticut General assumed no fiduciary responsibility when, under the terms of GR–81, it prohibited Clabir and HMW from withdrawing the funds in the Deposit Administration Account in a lump sum payment or when it refused to permit competitive bidding for those benefits supported by the Retired Lives Account.

Despite these clear precedents, plaintiffs appear to argue that Connecticut General exercised or otherwise usurped HMW's decision-making control over the terms and price of the guaranteed cost contract by relying upon the favorable terms of GR–81 during its negotiations with Clabir and HMW. More specifically, plaintiffs argue that "since any payment over time of the insignificant active life account would not pass IRS muster and certainly would not be sufficient to purchase annuities for all participants, the " 'appropriate' option that HMW should have been given was the choice of having *all* of its money back [both the active and retired lives accounts] to seek competitive bids." Plaintiffs' Post–Trial Mem. n. 8 at 21 (emphasis in original).

Even if, plaintiffs are correct, and any payment over time of the Deposit Administration Account was insufficient to purchase the active-lives benefits from another insurer, we cannot find, and plaintiffs have not cited, any authority for the proposition that ERISA's fiduciary duties require an insurer, and non-fiduciary, to rewrite the terms of an arm's length transaction, to the detriment of the insurer's shareholders, before entering into further negotiations with a pension plan. We cannot impose fiduciary obligations on Connecticut General for selling a product to the Plan merely because participants do not like the bargain that they once struck. While the $5.4 million held in the Deposit Administration Account may have been insufficient, alone, to purchase the accrued benefits due the active-lives, if coupled with the $8 million in the Trust Funds, there is no evidence that plaintiffs' had insufficient funds to competitively bid the active-lives benefits.[22] (Findings 44–52). When viewed in this light, Connecticut General merely offered to sell the guaranteed cost contract to HMW and negotiated the terms and price of such product on its own behalf. As the courts have held, simply urging the purchase of its products does not make an insurance company an ERISA fiduciary with respect to those products. *Flacche v. Sun Life Assur. Co. of Canada,* 958 F.2d 730, 734–35 (6th Cir.1992); *Consolidated Beef Indus. Inc. v. New York Life Ins. Co.,* 949 F.2d 960, 965 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992); *American Fed'n of Unions,* 841 F.2d at 664.

Moreover, while the pre-determined terms of GR–81 may have defined the outer limits of the negotiations between the parties, plaintiffs have failed to introduce any evidence which demonstrates that Clabir and HMW were compelled to purchase the guaranteed cost contract from Connecticut General upon the terms and at the price offered by Connecticut General. To the contrary, the evidence clearly demonstrates that Clabir and HMW carefully considered their options and actively negotiated the price with Connecticut General. (Findings 40–43). In fact, in the face of Clabir and HMW's bargaining power, Connecticut General reduced its price from $18.8 million to $16.9 million. (Finding 43). Furthermore, the terms of GR–81 appear

---

**21.** 29 U.S.C. § 1101(b) provides in relevant part: In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer.

**22.** Contrary to plaintiffs' allegations, there is no evidence that Connecticut General lied about size of the Deposit Administration Account at termination, thereby exercising discretionary control over the Plan's assets. (Finding 45 n. 13).

to have protected Plan participants from the very self-dealing of which Connecticut General now stands accused. The price and terms of the guaranteed cost contract were subject, in part, to the pre-determined prices of GR–81. (Finding 13). Benefits, for retirees, for which there was no room for negotiation, accounted for $11.5 million of the $16.9 million purchase price. (Finding 44–45). Similarly, the price of the active-lives benefits were subject, at least in part, to the actuarial tables of GR–81. (Finding 20). Accordingly, there is simply no basis for finding that Connecticut General exercised decision-making authority over the price or terms of the guaranteed cost contract purchased by the Plan.

## C. Surplus Assets Allocation Claim.

■ Plaintiffs also argue that Connecticut General became a fiduciary with respect to the allocation of the Plan's surplus assets when it selected one of three pre-approved PBGC formula and then determined that eighty-three percent (83%) of the surplus assets would revert to HMW and that the remaining seventeen percent (17%) would be allocated among the Plan participants. While we agree with plaintiffs that this decision involves a fiduciary undertaking,[23] we find no evidence that Connecticut General was ultimately responsible for making this decision. Rather, we find on the record before us, that it was HMW's responsibility, as the administrator of the Plan, to make this decision and that plaintiffs have failed to prove by a preponderance of the evidence that HMW or Clabir, delegated this responsibility or its decision-making authority to Connecticut General or that Connecticut General in fact exercised decision-making control.[24]

The evidence clearly demonstrates that Clabir made all of the fiduciary decisions

related to the Plan's termination. Clabir, fully cognizant of the over-funded HMW Plan and desirous of acquiring the largest possible portion of the surplus assets, made a tender offer for and acquired HMW in 1983. (Findings 26–27). Shortly thereafter, Clabir informed HMW that the Plan would be terminated, and by December, 1983, began to take action to effectuate that decision. In this regard, by January 1984, Clabir had retained the New York law firm of Donovan, Leisure, Newton & Irvine, a nationally prominent law firm, the Wyatt Company, an international actuarial consulting firm, and Coopers & Lybrand, a "Big Eight" accounting firm, to coordinate and oversee the termination of the HMW Plan. (Findings 28–32). Clabir appointed several of its senior officers, including Richard Van Hoesen, James Schell, and Bernard Marren, to coordinate and oversee all work on the termination. (Finding 29).

On January 5, 1984, Clabir called all of these parties together, for a meeting in Lancaster, Pennsylvania, to discuss the HMW Plan termination. (Finding 28). Mr. Van Hoesen of Clabir and Timothy O'Neill of Donovan, Leisure presided over this meeting, set timetables, and assigned responsibilities for the Plan's termination. (Finding 31). At this meeting, Connecticut General was assigned the task of calculating the amount of surplus assets and the allocation of such surplus between employer and employees. (Finding 33). Thereafter, between January 1984 and May 1985, Connecticut General selected, subject to Clabir's approval, the most appropriate of three, pre-approved PBGC formulae, and determined, based on certain actuarial assumptions, that eighty-three percent (83%) of the surplus assets would revert to the employer and the remaining seventeen per-

**23.** *See* Department of Labor Letter of Fiduciary Responsibility and Plan Terminations, addressed to Mr. John N. Erlenborn, Chairman of the Advisory Council on Employee Welfare and Pension Benefit Plans, dated March 13, 1986 ("DOL Letter").

**24.** While we agree with plaintiffs that Connecticut General's fiduciary status is wholly dependent upon Connecticut General's control over

the Plan's termination, Clabir and HMW's actions are, none-the-less, highly relevant to our inquiry. Since Clabir and HMW were ultimately responsible for all decisions related to the Plan's termination, plaintiffs have a heavy-burden of proving that Clabir delegated this authority to Connecticut General or that Connecticut General did, as plaintiffs allege, "pull the wool" over everyone's eyes and exercise decision-making control over the Plan's termination.

cent (17%) would be distributed among the Plan participants. (Findings 66–69).

During this time, employees questioned Connecticut General's calculations and complained to their elected representatives and the PBGC. (Finding 78). Shereff, Friedman, Hoffman & Goodman, a second law firm retained by Clabir, and Wyatt reviewed and reaffirmed the accuracy of Connecticut General's calculations. (Finding 78). Ultimately, however, Clabir conducted its own independent review of Connecticut General's surplus asset calculations and made the final decision to implement Connecticut General's calculations in dividing the surplus Plan assets between itself and the employees. (Findings 77, 79).

Taken together, we find no basis for finding that Connecticut General acted in any capacity other than as an actuary rendering professional advice for which there can be no fiduciary liability. *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1150–51 (3d Cir.1989) (quoting Interpretive Bulletin 75–5, 29 C.F.R. § 2509.75–5 (1988)); *see also Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 535–38 (7th Cir. 1991); *Mertens v. Hewitt Associates*, 948 F.2d 607, 610 (9th Cir.1991), *cert. filed*, 112 S.Ct. 2936, 119 L.Ed.2d 561 (1992); *Nieto v. Ecker*, 845 F.2d 868, 870 (9th Cir.1988).

The Seventh Circuit recently addressed this issue in the context of allegations against actuaries virtually identical to those found herein. In *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531 (7th Cir. 1991), the trustee and plan sponsor alleged, *inter alia*, that the defendant actuaries breached ERISA's fiduciary duties in connection with the termination of a pension plan by incorrectly calculating the distribution of benefits to a plan participant. 923 F.2d at 533–34. In *Pappas*, the plaintiff complained that the actuary defendant became a fiduciary when they gave advice to plan trustees and invited reliance on that advice, without disclosing the reasoning behind the actuarial assumptions and methodologies they adopted. *Id.* at 535–38. The court soundly rejected these claims, concluding that the Third Circuit's reasoning

in *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, should extend to the actuarial profession:

[T]he terms 'discretionary authority,' 'discretionary control,' and 'discretionary responsibility' in § 1001(21)(A) ... [speak] to actual decision-making power rather than to the influence that a professional may have over the decisions made by the plan trustees she advises.

\* \* \* \* \* \*

ERISA plan trustees hire actuaries because they lack the training to perform the required calculations themselves and because it would be inefficient for them to acquire it given the small amount of actuarial work they need to do to manage their plans.... This does not mean, of course, that plan administrators may not question their actuary's conclusions. Some may choose to do so, to a greater or lesser degree. Plaintiff's argument, however, would effectively require actuaries to lead their clients through the methodologies, assumptions, and calculations underlying the conclusions they reach, step by tortuous step; actuaries who did not provide this level of tutelage would risk coming within ERISA's definition of a fiduciary, with the potential liability that entails.... [W]e are reluctant to reshape the relationship between actuaries and their clients in this way, at least absent an unambiguous indication that Congress intended this result.

923 F.2d at 535, 538.

Contrary to plaintiffs' allegations, there is no evidence on the record before us that Connecticut General did more than provide actuarial advice to the Plan and invite reliance thereon. While Connecticut General selected which PBGC formulae would be used and, based on certain actuarial assumptions, calculated the allocation of surplus assets, the evidence clearly shows that both the choice of formula and the final calculations were subject to the review and ultimate approval of Clabir, HMW, and their outside advisers. (Findings 76–79). Accordingly, we must find that Clabir and HMW retained and exercised the actual decision-making authority as to whether or

not to distribute surplus assets on a basis consistent with Connecticut General's actuarial calculations.

### D. Connecticut General Role.

 Recognizing that professionals are ERISA fiduciaries "if they go beyond their normal roles and assume management or administrative responsibilities," *Painters of Philadelphia*, 879 F.2d at 1150 (quoting Joint Explanatory Statement of the Committee of Conference, p. 323, reprinted in 3 *Legislative History of the Employee Retirement Security Act of 1974* at 4590), plaintiffs seek to distinguish Connecticut General's conduct at Plan termination from the *Pappas* actuaries. In this regard, plaintiffs advance three arguments in support of their position that Connecticut General acted outside of the usual and customary role of an actuary and assumed management or administrative responsibilities with respect to the allocation of the Plan's surplus assets. First, plaintiffs argue that by virtue of Connecticut General's multifaceted relationship to the Plan, Connecticut General was able to exert an unusual degree of influence and discretion over the Plan's decision to adopt and implement Connecticut General's calculations. Second, plaintiffs argue that Connecticut General transcended its role as an actuary by intentionally manipulating its actuarial calculations in favor of HMW in an effort to exact an excessively high premium. Third, plaintiffs argue that Connecticut General acted outside the scope of an actuary when it made a legal determination that a reversion of surplus assets was permitted under the Plan documents.

#### 1. *Connecticut General's Multiplicity Of Services.*

With respect to their first argument, plaintiffs' seem to argue that having provided a variety of services and products to the Plan over the course of its forty-four (44) year history, thereby gaining HMW's respect and confidence, Connecticut General essentially had carte blanche over the decision to distribute most of the Plan's surplus assets to HMW. Plaintiffs' argument, however, is unsupported by both the case law and the facts of this case.

 Both the Seventh and Third Circuits have clearly held that a professional does not become a fiduciary by merely giving professional advice and seeking reliance upon that advice. *Pappas*, 923 F.2d at 535; *Philadelphia Painters*, 879 F.2d at 1150. Accordingly, the mere fact that Connecticut General may have developed a positive relationship with HMW over the years and that HMW may have been less likely to question Connecticut General's advice, does not make Connecticut General a fiduciary. Similarly, at least one district court has refused to infer fiduciary responsibility merely because an insurer has provided a variety of products and services to a plan, where none of these services, standing alone, created fiduciary duties:

> Plaintiffs contend that *Pappas* and similar cases are distinguishable because defendants herein provided more than advice; they performed a multiplicity of functions affecting the Plan's financial integrity in many ways even including the provision of the 'investment vehicle' for Plan assets—the Group Annuity Contracts. The Court disagrees, however, that a 'package deal' of services and products, none of which separately creates fiduciary status, necessarily betokens an unusual degree of influence because of their variety and number. In this case, despite the breadth of services involved and the Plan trustees' reliance thereon, the Court does not find that defendants exercised an *unusual* degree of influence, transcended their roles as consultants and sellers of insurance, or otherwise had control or authority over the Plan or its assets.

*Bozeman v. Provident Nat'l Assur. Co.*, No. 90–2925–4 1992 WL 328804 (W.D.Tenn. May 15, 1992) (Emphasis original). Accordingly, we cannot infer that Connecticut General exercised discretionary control over the Plan's termination by merely serving the Plan as both its insurer and actuary.

Moreover, as discussed above, there is absolutely no evidence that Connecticut General forced or otherwise usurped Cla-

bir's or HMW's independent discretion over the decision to distribute a majority of the Plan's surplus assets to HMW. On the record before us, it would defy logic to infer that Clabir appointed senior officers and hired and paid nationally prominent outside counsel and an international actuarial consulting firm only to have them delegate decision-making authority to Connecticut General or that Clabir was prepared to accept any calculations prepared by Connecticut General no matter what the result. (Findings 76–80). Accordingly, we must find that Clabir and HMW retained and exercised actual decision-making authority over the decision to distribute the Plan's surplus assets on a basis consistent with Connecticut General's actuarial calculations.

### 2. Connecticut General's Alleged Calculation Manipulations.

Plaintiffs argue that Connecticut General transcended its role as an actuary by intentionally manipulating its actuarial calculations in order to exact an excessively high premium in connection with its sale of the guaranteed cost contract to the Plan. Such argument, however, is plainly inconsistent with the statutory definition of the term "fiduciary" and has been flatly rejected by the courts in similar circumstances.

Congress took a *functional* approach to defining an ERISA fiduciary. The ERISA definition of "fiduciary" is limited to persons who exercise "discretionary authority," "discretionary control," or "discretionary responsibility" respecting the management or disposition of a plan's assets or the administration of the plan. Thus, in *Mertens v. Hewitt Associates*, 948 F.2d 607, 609–10 (9th Cir.1991), *cert. filed*, 112 S.Ct. 2936, 119 L.Ed.2d 561 (1992), the court rejected the argument that an actuarial consulting firm transcended its professional role and acted in a fiduciary capacity in rendering actuarial services to a plan because its advice was affected by an alleged conflict of interest, that is, the consultant was alleged to have employed improper actuarial assumptions leading to an underfunding of a pension plan because it did not want to jeopardize other lucrative services

which it was performing for the plan sponsor. Similarly, in *Nieto v. Ecker*, 845 F.2d 868, 870–71 (9th Cir.1988), the court dismissed a claim against an attorney who allegedly rendered services to an ERISA plan in an improper and fraudulent manner. Because the complaint did not allege that the attorney had authority over plan assets, the court rejected the argument that he was an ERISA fiduciary, even though his dishonesty may have led to the dissipation of plan assets. *Id.*

On the facts before us, plaintiffs have failed to prove that Connecticut General exercised any control over the decision of how to allocate the Plan's surplus assets. Although plaintiffs allege that Connecticut General acted intentionally, fraudulently, and reprehensibly as an actuary, no inference can be made that Connecticut General acted in any capacity other than as an actuary, performing standard actuarial calculations. Plaintiffs' argument that Connecticut General intentionally manipulated its calculations in an effort to exact a high premium for the guaranteed cost contract are irrelevant and merely provide a possible motive for Connecticut General's alleged misconduct. Wrongful motivation and conduct, however, are insufficient to establish fiduciary responsibility. Connecticut General is only a fiduciary if it exercised actual decision-making control over the allocation of the Plan's surplus assets. *Pappas*, 923 F.2d at 535; *Associates In Adolescent Psychiatry v. Home Life*, 941 F.2d 561, 568–79 (7th Cir.1991), *cert. denied*, — U.S. ——, 112 S.Ct. 1182, 117 L.Ed.2d 426 (1992); *Painters of Philadelphia*, 879 F.2d at 1150; *Mertens*, 948 F.2d at 610. To hold otherwise, would be to upset the well-reasoned principles behind fiduciary liability. A fiduciary is strictly liable for his or her mistakes whether negligent, malicious, or fraudulent, provided that the actor has undertaken a fiduciary obligation. Therefore, a court should be able to decide the extent to which an actor is a fiduciary independent from motive. Absent evidence that Connecticut General's exercised actual decision-making authori-

ty[25] with respect to the allocation of the Plan's surplus assets, we cannot depart from the clear precedents of *Pappas* and *Painters of Philadelphia*. Accordingly, we cannot find that Connecticut General was an ERISA fiduciary.

Moreover, even if we were to adopt plaintiffs' argument that Connecticut General should be subject to fiduciary liability for any intentional wrong-doing, there is no evidence that Connecticut General intentionally manipulated its calculations in this case. (Finding 75). Rather, plaintiffs ask us to infer such wrong-doing merely because, in plaintiffs' mind, Connecticut General could have had no acceptable reason to use the actuarial assumptions it adopted except for its own financial security. Contrary to plaintiffs' argument, however, Connecticut General's calculations are not so blatantly unreasonable to support such an inference. (Finding 75). At best Connecticut General's calculations are negligent, and, as such, Connecticut General's conduct falls squarely within the rubric of *Pappas*, 923 F.2d at 537–38.

Plaintiffs rely heavily on *Arakelian v. National Western Life Insurance Company*, 680 F.Supp. 400 (D.D.C.1987), *request for reconsideration denied*, 724 F.Supp. 1033 (D.D.C.1989). In *Arakelian*, the court held that the defendant insurance company was liable for self-dealing and became a fiduciary when it invested the assets of a pension plan in the insurance company's own annuities:

The Court's decision [in 1987] is strengthened further by [the defendant insurance company's] decision to invest the assets of the plan solely in its own annuity contract. In doing so [the defendant] has created an inherent conflict of interest. (Footnote omitted). [The defendant] has a loyalty to its shareholders to maximize their dividends by diminishing excess interest rates, and a conflicting loyalty to the beneficiaries of the Plan to maximize their benefits by keeping excess interest rates high. If [the defendant] chooses to place itself in this precarious position, it must be willing to accept the consequences resulting from strict scrutiny of its decision.

*Id.*, 724 F.Supp. at 1036. Applying this reasoning, plaintiffs argue that Connecticut General's conduct "cost" the Plan more than $2 million dollars by prohibiting the Plan from seeking competitive bids and then by charging the Plan a "captive" premium. They maintain that Connecticut General must be held accountable for the conflict of interest created by its dual role as an insurer and actuary.

Plaintiffs' reliance on the *Arakelian* case is misplaced on both factual and legal grounds. First, the insurer in *Arakelian* was the plan sponsor, administrator, and named fiduciary, that is, the *Arakelian* insurer held the same position as HMW in this case.[26] 680 F.Supp. at 402. Second, the insurer/plan sponsor in *Arakelian* had the *discretion* under the contract to purchase the annuities in question from anoth-

**25.** In its Motion in Opposition to Connecticut General's Motion for summary judgement, plaintiffs alluded to an alleged conspiracy between Clabir and Connecticut General, under which Connecticut General allegedly offered to doctor its calculations in exchange for an excessive purchase price for the guaranteed cost contract. If in fact, there was any evidence of such a quid pro quo, Connecticut General could have been said to exercise actual decision-making authority over the allocation of surplus assets. However, plaintiffs have not proceed to trial on such a conspiracy theory nor have they introduced any evidence to support such a conclusion.

Although the courts have held that an ERISA beneficiary could maintain a cause of action against a non-fiduciary who had conspired with or induced an ERISA fiduciary to breach fidu-

ciary duties owed to the beneficiary, *Pappas v. Buck Consultants*, 923 F.2d 531, 541–542 (7th Cir.1991); *Nieto v. Ecker*, 845 F.2d 868, 871 (9th Cir.1988); *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir.1987), since we find no evidence to support such a finding in this case, these cases are inapplicable to the facts before us.

**26.** Plaintiffs argue that this distinction is irrelevant since the *Arakelian* court held that the defendant insurer was also a fiduciary because of its control over the assets as the issuer of the plan's deposit administration contract. Pls.' Mem. at 29 n. 12. This *Arakelian* holding, however, was specifically rejected by the Third Circuit in *Mack Boring and Parts v. Meeker Sharkey Moffitt*, 930 F.2d 267, 272–73 (3d Cir.1991). *See infra* n. 19.

er insurer. *Id.* As discussed above, Connecticut General was not the plan sponsor, administrator or named fiduciary of the Plan. Nor was Connecticut General exercising discretion under the contract in insisting on adherence to the terms of the contract by prohibiting HMW from canceling the guaranteed annuity benefits previously credited by Connecticut General for retired Plan participants, by prohibiting HMW from withdrawing the funds supporting those funds, and by prohibiting HMW from repurchasing such benefits from another insurer upon the Plan's termination. Moreover, Connecticut General's dual role as an insurer and actuary did not create a conflict of interest. Connecticut General's sole loyalty lay with its shareholders. Since Connecticut General assumed no fiduciary liability by performing standard actuarial calculations or by seeking to enforce the terms of a contract, bargained for at arms length, Connecticut General owed no loyalty to the Plan participants.

### 3. *Connecticut General's Control Over The Reversion Decision.*

Plaintiffs argue that Connecticut General transcended its ordinary and customary role as an actuary when it determined, prior to calculating the 83%–17% split, that under the terms of the Plan documents, at least a portion of the surplus assets would revert to the company. In support of their position, plaintiffs rely on two conflicting provisions of the Plan documents—an old pre-ERISA provision in the Summary Annual Reports stating that "in no event will any funds revert to the Company" (Finding 61), and the new post-ERISA provision in the Plan Document stating that "no contributions will revert to the Company except to the extent that aggregate Company contributions are in excess of the Company's liabilities under the Plan." (Finding 55).

Contrary to plaintiffs' allegations, there is absolutely no evidence that Connecticut General ever considered or was asked to consider whether or not the Plan documents would permit a portion of the Plan's surplus assets to revert to the employer pursuant to § 4044(d)(1). (Finding 63). In fact, as plaintiffs so aptly point out, the record is silent as to whether this issue was ever discussed or considered by any of the parties involved in the termination. (Finding 63). Nor is there any evidence that Connecticut General assumed control over the reversion issue by intentionally concealing the conflicting language from Clabir or HMW. (Finding 64). In fact, the evidence suggests that Connecticut General was completely unaware of the conflicting language until plaintiffs filed this lawsuit against the Original Defendants. (Finding 64). Rather, the evidence clearly demonstrates that Clabir and its outside consultants all proceeded on the assumption that at least a portion of the plan's surplus would revert; the only question was how much. (Finding 64).

Nevertheless, plaintiffs argue that in order to calculate the allocation of surplus assets, Connecticut General must have first reviewed the Plan documents and made a legal determination that reversion was appropriate. In so doing, plaintiffs argue that Connecticut General transcended the usual role of an actuary. Plaintiffs rely heavily on the testimony of John Markley, an actuary who, on the one hand, testified that it would be beyond the usual and customary role of an actuary to review Plan documents and make legal determinations thereon and, on the other hand, testified that as an actuary, he would have reviewed the Plan documents in question and notified Clabir that they should retain legal counsel to interpret the conflicting language.

Plaintiffs appear to be arguing that by failing to act outside of their assigned role as an actuary—i.e. by failing to make a legal determination of whether or not reversion was appropriate, Connecticut General should now be held accountable for failing to assume responsibility for a decision it was never authorized to make. Plaintiffs' argument would effectively require that actuaries transcend their usual and customary roles or risk coming within ERISA's definition of fiduciary. Like the *Pappas* court, we too are reluctant to re-

shape the relationship between actuaries and their clients absent a clear congressional mandate.

Taken together then, there is no evidence that Connecticut General acted in any capacity other than an actuary performing standard actuarial calculations, and as such, there can be no fiduciary duties pursuant to ERISA. *Pappas,* 923 F.2d at 535; *Philadelphia Painters,* 879 F.2d at 1150.

### CONCLUSIONS OF LAW

1. GR–81 did not vest Connecticut General with discretionary control over the Plan or its assets.

2. Connecticut General did not in the course of its activities in connection with the termination of the Plan undertake any of the decision-making responsibilities customarily performed by a plan administrator as part of the plan administrator's duty at the termination of a plan to purchase from an insurer a contract to provide the benefits required by the PBGC in annuity form.

3. Connecticut General did not exercise discretionary control over the Plan or its assets when it sought to enforce its rights under the terms of GR–81 and prohibited Clabir and HMW from withdrawing funds in the Deposit Administration Account in a lump sum payment or when it refused to permit competitive bidding for those benefits.

4. Connecticut General did not exercise discretionary control over price or terms of the guaranteed cost contract which it sold to the Plan at termination; rather, the final premium price was the product of negotiations between HMW and Connecticut General.

5. Connecticut General did not in the course of its activities in connection with the termination of the Plan undertake or perform any of the decision-making responsibilities customarily performed by a plan administrator as part of the plan administrator's duty under ERISA to allocate the Plan's assets upon its termination.

6. With respect to the actuarial calculations performed by Connecticut General at Plan termination, Connecticut General did not act in any capacity other than as an actuary rendering professional advice. Accordingly, Connecticut General did not exercise discretionary control over the amount and allocation of the Plan's residual assets.

7. Connecticut General did not exercise discretionary control over the decision of whether or not the Plan documents permitted a reversion of surplus assets to Clabir and HMW.

### CONCLUSION

For the foregoing reasons, we find on the record before us that Connecticut General did not exercise actual decision-making control over the price and terms of the guaranteed cost contract it sold to the Plan or over the distribution of the Plan's surplus assets in favor of HMW at the Plan's termination. Accordingly, we find that Connecticut General was not an ERISA fiduciary, and we grant defendant Connecticut General's Motion for Judgment on Partial Findings of Fact.